### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-258-TFH** |
| **v.** | : | |
| | : | |
| **TROY SARGENT,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Troy Sargent to twenty-seven months' incarceration, which is the middle of the Sentencing Guidelines range,[1] three years of supervised release, $2,000 in restitution, and the total, mandatory special assessment of $285.[2]

### I.    INTRODUCTION

The defendant, Troy Sargent, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[3]

---

[1]   As noted below, at 21, Sargent disputes the Guidelines calculation that produces this range.

[2]   The specific breakdown is as follows: $100 each for Counts One and Two, 18 U.S.C. § 3013(a)(2)(A); $25 each for Counts Three through Fire, 18 U.S.C. § 3013(a)(1)(A)(iii); and $10 for Count Six, 18 U.S.C. § 3013(a)(1)(A)(ii).

[3]   As of October 17, 2022, the approximate losses suffered as a result of the siege at the United

Sargent joined the riotous crowd in the Capitol's West Plaza. Before the police line was breached, he scaled scaffolding that had been erected for the construction of the inauguration stage, giving him a good view of the entire riot. Seeing rioters fighting with police officers, and officers defending themselves with force, Sargent sought to join the melee. There, he made his way to the front of the crowd—which had, moments before, broken the police line and forced officers to begin retreating to the Lower West Terrace—and assaulted an unknown United States Capitol Police officer.

The government recommends that the Court sentence Sargent to 27 months' incarceration, which is at the low end of the advisory Guidelines' range of 24-30 months, which the government submits is the correct Guidelines calculation. A 27-month sentence reflects the gravity of Sargent's conduct while acknowledging his acceptance of responsibility and the differences between him and other rioters.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Sargent among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding

---

States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Sargent's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. From about 1:00 p.m. to about 2:30 p.m., a mob of rioters overran barriers marking parts of the Capitol grounds as restricted, and flooded into the grounds, including the West Plaza. For that hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 1: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right). In each of these images, a media tower is visible in the center.*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

4

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Figure 2: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

***Injuries and Property Damage Caused by the January 6, 2021 Attack***

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See*

*id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.    Sargent's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Sargent traveled from Pittsfield, MA to Washington, D.C. The purpose of his trip was to attend the former President's rally on January 6, 2021. Sargent traveled by car with his girlfriend and another person. Sargent's friend was arrested during the night of January 6

for a curfew violation. Sargent and his girlfriend returned to Pittsfield, without that friend, on January 7.

Through body-worn camera footage, and several short videos captured on Sargent's phone, the government was able to reconstruct Sargent's unlawful conduct on January 6. Sargent waded through the dense crowds in the West Plaza until he reached the media tower in the middle of the crowd, near the front of the West Plaza and the police line. Sargent scaled that tower and recorded himself doing so, commenting, "You thought I was going to come here and not climb the fucking ladder?" Exhibit 1. From his elevated position, he surveyed the scene. He could see the police line guarding the West Plaza, how thoroughly rioters overwhelmed police officers, how densely packed the rioters were, and how far back the crowd of rioters stretched. Exhibit 2.



*Figure 3: In a still frame from Exhibit 2, Sergeant recorded the crowd of rioters confronting police officers.*

While recording the scene, he commented, "We got a clash of police going. We're on the ladder.

We're going up. Shit's getting fucking rowdy out here now. We got flash bangs." Exhibit 3.



*Figure 4: In a still frame from Exhibit 3, Sergeant recorded a gap in the crowd of rioters, a break in the police fence line, and officers standing in front of the fence line. This is consistent with Sergeant's comments, heard in Exhibit 3, about "a clash of police" and "flash bangs."*

And, Sargent did go up: up to the police line. When Sargent recorded these videos, the police line was intact. But when he engaged with the officers, the police line had been broken by rioters and officers were about to regroup and retreat. As noted in Sargent's statement of offense, at about 2:30 p.m., Sargent stepped forward from a crowd of rioters, swung his open hand at an unknown U.S. Capitol Police officer, and made physical contact with that officer. An officer immediately instructed Sargent and other rioters not to "start attacking people." Ignoring that command, about 30 seconds later, Sargent advanced to the front of the crowd again, swinging his

11

open hand at the same U.S. Capitol Police officer in an apparent attempt to strike that officer, but instead smacking a fellow rioter in the side of the head. Sargent then retreated into the crowd again. Exhibit 7, Exhibit 8, ECF No. 57 ¶ 9.







*Figure 5: In this series of four still images from Exhibit 7, Sargent reached for a U.S. Capitol Police officer with his open hand and made contact with the officer. The officer's body obstructed the view of Sargent at the time he made contact, but Sargent was visible immediately thereafter.*





*Figure 6: In these two still images from Exhibit 8, Sargent swung his open hand at U.S. Capitol Police officer and struck another rioter in the head.*

It is clear from Sargent's cell phone videos that Sargent meant to punch the U.S. Capitol Police officer, and that Sargent thought he had done so. In one of his videos, apparently taken immediately after this incident, Sargent bragged, "Alright, we're pushing them back. We got gassed, we got pepper sprayed, and I duffed a cop in the face." Exhibit 4.[4] He then yelled at an officer, "What are you going to do? Gas us again?" Then, a fellow rioter helped Sargent wash out his eyes with water. Another cell phone video, recorded in front of a police line in a different part of the Capitol, showed Sargent berating officers in riot gear. Sargent appeared to call them "a bunch of fucking traitors," told the officers "you should be ashamed of yourselves, you took a fucking oath to the Constitution," and further said, "fuck you guys. You guys are either with them or with us." Exhibit 5.[5] Sargent then returned to his hotel; through their hotel room window, he and his friend watched police reinforcements travel to the Capitol. Exhibit 6.

On Facebook, Sargent confirmed that he thought he had punched a police officer. In messages sent to various people on January 6, Sargent wrote "I got pepper sprayed for punching a cop" that he "duff that cop out twice" after getting pepper sprayed, and that he "[p]unched the cop 3 times in their [visor]." In multiple Facebook conversations on January 8, sent to large groups of recipients, Sargent acknowledged heading for the front of the crowd of rioters after he saw police deploy tear gas into the crowd. He asked one friend, "Tell me somebody got video of me punching the cops in their visor," and bragged that "I got two hits in on the same rookie cop and then he

---

[4] Based on context, this video appears to have been taken after the police line in the West Plaza was broken, but before police fully had retreated to the Lower West Terrace.

[5] Sargent's face cannot be seen in this video, but the government here quotes the loudest, clearest, and most consistent voice, which sounds like Sargent's voice as heard elsewhere. As this video was recorded on Sargent's phone, it is likely that he was holding the receiver close to his own mouth.

maced me." Sargent elaborated, writing that "every time [the officer] came in his visor was all full of [mace] . . . I knew [he] couldn't see s*** so I just jumped out from behind somebody[,] punched him as hard as I could [right] in his [visor]."

*Sargent's FBI Interview*

On March 9, 2021, following his arrest, Sargent was interviewed by the FBI. His statements to the agents were filled with untruths, minimizing statements, and sarcasm. During that interview, Sargent told the FBI that the riot caught him by surprise. Sargent told the FBI that he, his girlfriend, and his friend attended the rally together, although his girlfriend was not a supporter of the former President. The three left the rally after the former President's speech, got lunch at a burger place, and then walked to the Capitol. At some point, Sargent was separated from his friend. Sargent described the riot at the Capitol as catching him off guard, remarking that "I thought we were going to the same old typical . . . Trump rally, been there a hundred times, you know, same thing, and then all this crazy stuff happened. And now, you know, I'm wrapped up in an insurrection."

Sargent admitted that he knew Congress was certifying the election results but claimed that he did not know Congress was meeting in the Capitol; instead, he said that he thought Congress was meeting at the Supreme Court. Sargent acknowledged that he was present on Capitol grounds and identified himself in images from January 6, 2021. Sargent claimed that he did not scale the scaffolding near the West Plaza.[6] He claimed not to understand why police were deploying tear gas and pepper spray into the crowd, and further claimed that people were standing around innocently, even though he was at an elevated position where he would have been able to see

---

[6] It appears, from Sargent's videos, that he scaled the media tower in the middle of the West Plaza. The scaffolding was to either side of the plaza.

rioters assaulting police officers.

During the interview, Sargent told the officers that he engaged with police officers because his girlfriend—who, at the time, was pregnant—was tear gassed or pepper sprayed, so Sargent got mad and went to yell at officers. Sargent falsely denied making physical contact with officers or trying to hit them. When FBI agents asked him about hitting someone in the head, Sargent said he did not remember the incident, and did not recall every single thing that happened on January 6, 2021.

After agents showed him video from body-worn camera, Sargent claimed that he accidentally hit another rioter, but denied he had the intent to swing his hand at the police officer. When shown footage depicting him stepping out of the crowd to push an officer, Sargent minimized his conduct, saying "you can extrapolate it and perceive it however you want . . . I can perceive it as me swatting away a mosquito if you want."

Sargent claimed that he felt remorse for going to the Capitol grounds on January 6, and not just because he was caught, saying "I really honestly just wish I never went. Not because of this, I wish I never went the day after, . . . when I woke up the next morning in the hotel and wished I never went." But despite this claim, on January 8, 2021 (the day after the day after), Sargent bragged to his friends about punching a police officer.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 26, 2021, a federal grand jury returned an indictment charging Sargent with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a

Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); and Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F). On November 10, 2021, a federal grand jury returned a superseding indictment charging the same offenses.

On June 27, 2022, Sargent pled guilty to all charges in the Superseding Indictment. This plea was entered without a plea agreement between the parties.

## IV.    STATUTORY PENALTIES

Sargent now faces sentencing on all six charges in the Superseding Indictment, which are identified above. There was no written plea agreement specifying the maximum penalties by statute, although Sargent was advised of the maximum penalties during his change of plea hearing. As noted by the U.S. Probation Office, the maximum sentences are as follows:

For Count One, Sargent faces up to five years of imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years.

For Count Two, Sargent faces up to eight years of imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years.

For Count Three, Sargent faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year.

For Count Four, Sargent faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year.

For Count Five, Sargent faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year.

For Count Six, Sargent faces up to six months of imprisonment and a fine of up to $5,000. Additionally, as Count Six is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government submits that the Guidelines calculations for each count of conviction in this case is as follows:

**Count One, Civil Disorder, 18 U.S.C. § 231(a)(3)**

| | |
|---|---|
| Base offense level: U.S.S.G. § 2A2.4(a): | 10 |
| Physical contact: U.S.S.G. § 2A2.4(b)(1)(A) | +3 |
| U.S.S.G. § 2A2.4(c)(1) Cross Reference Applies | |
| Base offense level: U.S.S.G. § 2A2.2(a) | 14 |
| Official victim, U.S.S.G. § 3A1.2(b) | +6 |
| Total Offense Level: | 20 |

**Count Two, Assaulting Officers, 18 U.S.C. § 111(a)**

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.4 | 10 |
| Physical contact: U.S.S.G. § 2A2.4(b)(1)(A) | +3 |
| U.S.S.G. § 2A2.4(c) Cross Reference Applies | |
| Base offense level: U.S.S.G. § 2A2.2(a) | 14 |
| Official victim, U.S.S.G. § 3A1.2(b) | +6 |
| Total offense level: | 20 |

**Count Three, Entering Restricted Grounds, 18 U.S.C. § 1752(a)(1)**

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2B2.3(a) | 4 |
| Restricted Grounds, U.S.S.G. § 2B2.3(b)(1)(vii) | +2 |
| U.S.S.G. § 2B2.3 (c)(1) Cross Reference Applies | |
| Base offense level: U.S.S.G. § 2A2.2(a) | 14 |
| Total Offense Level | 14 |

**Count Four, Disorderly Conduct on Restricted Grounds, 18 U.S.C. § 1752(a)(2)**

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.4(a) | 10 |
| Physical Contact, U.S.S.G. § 2A2.4(b)(1) | +3 |
| Total Offense Level | 13 |

**Count Five, Physical Violence in Restricted Grounds, 18 U.S.C. § 1752(a)(4)**

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.4(a) | 10 |
| Physical Contact, U.S.S.G. § 2A2.4(b)(1) | +3 |
| Total Offense Level | 13 |

**Count Six, Physical Violence in the Capitol Grounds, 40 U.S.C. § 5104(e)(2)(F)**

The Sentencing Guidelines do not Apply to Class C misdemeanor. U.S.S.G. § 1B1.9.

**Multi-Count Analysis**

Counts One, Two and Five group pursuant to U.S.S.G. § 3D1.2(a) and (b) because the victim is the assaulted and obstructed police officer. Counts Three and Four group pursuant to U.S.S.G. § 3D1.2(a) and (b) because the victim is Congress. Counts Three and Four group with Counts One, Two and Five pursuant to U.S.S.G. § 3D1.2(c) because the conduct in counts One, Two and Five constitute the basis for an adjustment to the guideline applicable to" Counts Three and Four.

Sargent disputes these calculations. He argues that, instead, the aggravated assault guidelines do not apply to any count of conviction, and that the Guidelines should be calculated using the Guidelines provision for obstructing or impeding officers, U.S.S.G. § 2A2.4. Under this provision, the base offense level is ten, U.S.S.G. § 2A2.4(a); an additional three levels is added for physical contact, U.S.S.G. § 2A2.2(b)(1), and Sargent is eligible for a two-level reduction of responsibility, pursuant to U.S.S.G. § 3E1.1(a). Accordingly, Sargent would have an overall offense level of 11.

Here, Sargent pleaded guilty to the entire Indictment, which included a charge of obstructing, impeding, or interfering with a police officer during a civil disorder, in violation of 18 U.S.C. § 231(a)(3), and assaulting, resisting, or impeding certain officers or employees in violation of 18 U.S.C. § 111(a)(1). As a preliminary matter, U.S.S.G. § 2A2.4 is the applicable guideline for Sargent's conduct for both counts. But section 2A2.4(c) instructs that § 2A2.2 be applied "[i]f the conduct constituted aggravated assault." In that phrase, "conduct" refers to all relevant conduct,

21

not simply the conduct underlying the crimes for which Sargent was convicted. *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997). Section 2A2.2 defines "aggravated assault" as, *inter alia,* "a felonious assault that involved . . . (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1.

The cross-reference in §2A2.4(c) applies here because the conduct charged in the indictment constituted an aggravated assault. The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). Sargent's conduct was certainly a threat to inflict injury. He admitted, in his Statement of Offense, that he swung his open hand at the victim officer and made physical contact. ECF No. 57 ¶ 9. Officers certainly perceived that action, reasonably, as capable of causing bodily harm: the defendant was cautioned "Do not start attacking people." *Id.* Immediately after that, the defendant tried to strike the same victim officer, again, with his open hand. *Id.* And, the defendant understood both strikes as an attempt to inflict injury upon another, saying that he "punched [the officer] as hard as I could

[right] in his [visor]" and "I got two hits in on the same rookie cop and then he maced me." *Id.* ¶ 10. Thus, Sargent committed a "felonious assault."

The "felonious assault" here qualified as an "aggravated assault" as defined in U.S.S.G. §2A2.2 cmt. n.1. As noted above, an aggravated assault in the Guidelines is a "felonious assault" that involved . . . an intent to commit another felony." *Id.* Here, the interference with police during a civil disorder in violation of 18 U.S.C. § 231(a)(3) involved the intent to commit the felony violation of assaulting, resisting or impeding certain officers (18 U.S.C. § 111(a)(1) and (b)). In other words, Sargent assaulted and interfered with police officers engaged in the performance of their official duties by joining a crowd that broke their defensive line and that was continuing to threaten them; he made his way to the front of that crowd, and assaulted them himself. Other courts have applied the cross-reference in §2A2.4(c) in analogous circumstances. *See United States v. Leffingwell*, 21-cr-5 (ABJ), ECF No. 53 at 12-24.[2] The converse is true as well: Sargent's assault was committed with the intent to commit the offense of civil disorder. Sargent well understood the circumstances of his conduct: he was in an elevated position, and saw clashes between the police and rioters, before descending the media tower and assaulting a police officer himself. He knew a civil disorder was occurring, and when he assaulted a United States Capitol Police officer, he intended to join it.

The U.S. Probation Office calculated Sargent's criminal history as category I, which the Government does not dispute. PSR ¶ 60. Accordingly, based on the government's calculation of Sargent's total adjusted offense level, after acceptance of responsibility, at 17, Sargent's Guidelines imprisonment range is 24 to 30 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. While each defendant should be sentenced based on his or her individual conduct, each individual person who assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. A person who fought with police—as Sargent did—would have seen how the police were vastly outnumbered by members of the crowd and struggled to control it.

While looking at Sargent's individual conduct, this Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged

any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration. Specifically, although it does not appear that Sargent attempted to enter the Capitol building, the facts show that he was keen to flight with police on January 6, 2021. During the riot, Sargent scaled the media tower in the center of the West Plaza, near the inauguration stage. There, he was in a position to see other members of the crowd as they clashed with police officers. He was in a position to observe how and where police officers were overwhelmed by the mob and struggled to contain it. Indeed, he seemed to revel in the chaos. Indeed, Sargent recorded himself on scaffolding, watching the crowd and the police. As he would later write on Facebook, to a group of approximately 50 people, "[a]fter I seen them [the police] throwing them flash grenades into the crowd I had to get off the ladder and go get me some."

Thereafter, Sargent climbed down from the scaffolding, joined the crowd, made his way to the front of the crowd. At approximately 2:30 p.m., he tried—twice—to strike a U.S. Capitol Police officer. Once, he did so successfully, swinging his open hand at a U.S. Capitol Police officer and making contact with the officer.[7] Immediately thereafter, an officer admonished the crowd, "Do

---

[7] The identity of this officer is unknown.

not start attacking people." Thirty seconds later, Sargent swung his open hand at the U.S. Capitol Police officer again, instead hitting another rioter in the side of his head. Sargent's Facebook messages made clear that he actually thought he struck the officer. In a Facebook message, sent after the riot, Sargent wrote "I got two hits in on the same rookie cop and then he maced me" and "yeah every time he came in his visor was all full of [mace so] I knew [he] couldn't see s*** so I just jumped out from behind somebody punched him as hard as I could [right] in his [visor]." Sargent bragged to a second person that he "[p]unched the cop 3 times in their [visor]" and told a third person "[w]hatever I Duff that cop out twice."

The timing of Sargent's assaults illustrates the danger that he, and members of the crowd, posed on January 6, 2021. About 2 minutes before Sargent's assaults, rioters had broken the police line in the West Plaza, forcing officers to retreat through a central staircase up to the Lower West Terrace, and into the Lower West Terrace tunnel—where they endured more than two hours of savage assaults by an angry mob. Officers were fatigued and seeking safety when Sargent decided to engage them. And, although Sargent's assaults happened after the line had broken, it was the collective force of numerous assaults, large and small, just like Sargent's, that wore down the officers and enabled the crowd to break the police line.

Sargent's words and actions, on January 6, 2021 and thereafter, reveal that he viewed this mob violence as something to celebrate, and to gleefully participate in. His conduct demands a lengthy sentence of imprisonment.

### B.  Sargent's History and Characteristics

The presentence report notes that, although Sargent has no criminal history points under the Sentencing Guidelines, he has four prior arrests for assaults or other violent acts which—due

to their age and disposition—do not count. ECF No. 59 ¶¶ 64, 66, 69, 70. These arrests help contextualize Sargent's behavior at the United States Capitol on January 6, 2021. While the government does not seek an upward variance based on this, Sargent's history and characteristics suggests that the recommended sentence is warranted.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sargent's criminal conduct, assaulting a police officer, is the epitome of disrespect for the law. When Sargent entered the Capitol grounds, and especially after he climbed to an elevated position, it was abundantly clear to him that police officers were under siege. They were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                              at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

---

[9] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a substantial term of incarceration. First, although Sargent has a criminal history category of I, his history of arrests shows a clear pattern of assaultive behavior which is not present for many other defendants who share the same category. *See* Section VI(B) *supra.* Second, although Sargent has now expressed remorse and contrition, ECF No. 67 ¶ 33, his social media statements on and after January 6 showed that he reveled in the violence and chaos. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Sargent's own statements demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10] In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted'

_____

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously-sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the case of *United States v. Kevin Douglas Creek*, 1:21-cr-00645-DLF, in which Judge Friedrich sentenced the defendant to a term of 27 months of incarceration, provides a suitable comparison to the relevant sentencing considerations in this case. Creek, like Sargent, was present in the Lower West Terrace at around 2:30 p.m. He was part of the crowd that surged against the police line and broke it; he committed further assaults against officers thereafter. Creek struck one officer in the face and shield with his bare hands. He shoved and kicked a second officer, then picked up a ratchet strap and threw it at him. 1:21-cr-00645-DLF ECF No. 48 at 11-18. Creek's assaults occurred at roughly the same time and in the same location as Sargent's assault, and—before his use of the ratchet strap—similarly involved the use of bare hands. Like Sargent, Creek was in a position to see the size of the mob, and how it outnumbered police officers. Creek assaulted two officers to Sargent's one, and Creek was more successful in making contact with officers than Sargent was; his conduct was, therefore, more serious. But both contributed, together with the mass of rioters, to breaking the police line and overwhelming officers in the West Plaza.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. <u>See</u> 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under <u>Hughey</u>).[11]  Both require

---

[11]While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).   The defendant in this case did not enter into a plea agreement.

identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[12] _See_ 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" _United States v. Ekanem_, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. _See_ _Papagno_, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. _United States v. Bikundi_, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. _See_ _Emor_, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[13] _United States v. Gushlak_, 728 F.3d 184, 196 (2d Cir. 2013); _see_ _United States v. Sheffield_, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact

---

[12] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.   _See_ _United States v. Emor_, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[13] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."   _Fair_, 699 F.3d at 513.   Here, the Court should find that Sargent's conduct in entering the Capitol building as part of a mob caused damage to that building.

restitution amount") (citation omitted); _United States v. James_, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); _United States v. Burdi_, 414 F.3d 216, 221 (1st Cir. 2005) (same); _see also Paroline v. United States_, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." _United States v. Williams_, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" _Fair_, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[14]

---

[14]Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  See  18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Sargent to pay $2,000 in restitution for his convictions on Counts One through Five. This amount fairly reflects Sargent's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 27 months, which is the middle of the Guidelines range as calculated by the Government and the Presentence Report, three years of supervised release, restitution of $2,000, and the total, mandatory special assessment of $285.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:    */s/ Michael J. Romano*
       MICHAEL J. ROMANO
       Trial Attorney, Detailee
       IL Bar No. 6293658
       555 4th Street, N.W.
       Washington, D.C. 20530
       Telephone No. (202) 307-6691
       michael.romano@usdoj.gov