1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

2
     * * * * * * * * * * * * * * *    )
3    UNITED STATES OF AMERICA,        )    Criminal Action
                                      )     No. 21-00258
4                    Plaintiff,       )
                                      )
5        vs.                          )
                                      )
6    TROY SARGENT,                    )    Washington, D.C.
                                      )    December 12, 2022
7                    Defendant.       )    11:09 a.m.
                                      )
8    * * * * * * * * * * * * * * *    )

9

10                  TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE THOMAS F. HOGAN,
11               UNITED STATES SENIOR DISTRICT JUDGE

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:        MICHAEL J. ROMANO, ESQ.
                                U.S. DEPARTMENT OF JUSTICE
15                              1331 F Street, Northwest
                                Washington, D.C. 20004

16

17   FOR THE DEFENDANT:         JOSHUA R. HANYE, ESQ.
                                OFFICE OF THE FEDERAL PUBLIC
18                                DEFENDER
                                51 Sleeper Street
19                              Boston, Massachusetts 02130

20
     FOR U.S. PROBATION:        HANA FIELD
21

22   REPORTED BY:               LISA EDWARDS, RDR, CRR
                                Official Court Reporter
23                              United States District Court for the
                                  District of Columbia
24                              333 Constitution Avenue, Northwest
                                Room 6706
25                              Washington, D.C. 20001
                                (202) 354-3269

```
 1              THE COURT:  Good morning.
 2              THE COURTROOM DEPUTY:  Good morning, your Honor.
 3   This is Criminal Matter 21-258, the United States of America
 4   versus Troy Sargent.
 5              On behalf of Probation, we have Hana Field.
 6              Counsel, please come forward and state your
 7   appearance for the record, beginning with the Government.
 8              MR. ROMANO:  Good morning, your Honor.  Michael
 9   Romano for the United States.
10              I hope the Court doesn't mind if I keep this on
11   this morning.  There have been a couple of positives around
12   the office, and I just want to make sure to be cautious for
13   everyone.
14              THE COURT:  You can keep it on; and stay as far
15   away from me as you can.
16              Thank you, Mr. Romano.
17              MR. HANYE:  Good morning, your Honor.  Josh Hanye
18   for Mr. Sargent.
19              THE COURT:  Thank you for coming down, Mr. Hanye.
20              Mr. Sargent is here as well.  I know he's been
21   transferred around a lot to get here, but he's here now.
22              THE DEFENDANT:  Good morning, your Honor.
23              THE COURT:  We're ready to proceed with the
24   sentencing this morning.
25              And I think there's a public line.  If family
```

1    members are on the public line, that's fine.  They can hear

2    the sentencing as well.

3          And does Mr. Sargent have family here today?

4          MR. HANYE:  He does.  That's his mother in the

5    audience as well.

6          THE COURT:  Thank you.

7          Well, let me just review what I have read so far

8    and where we are on this matter.  And then obviously, we'll

9    hear from counsel and we'll hear from Mr. Sargent.

10          I have received the presentence report some time

11   ago, as counsel have, and Mr. Sargent's had a chance to

12   review it, from Ms. Field, who's here today as well, the

13   probation officer who wrote the report.

14          And I have received the Government's memorandum in

15   aid of sentencing with its reference to the videos and all.

16   I don't know if they have the videos up today, but we're

17   familiar with those.  And I've reviewed that carefully.

18          I've reviewed the Defendant's sentencing

19   memorandum and attachments.  By that, I mean the sentencing

20   memorandum on behalf of Mr. Sargent.  And I appreciate the

21   work that Mr. Hanye put into it.  It was a good sentencing

22   memorandum.

23          I've reviewed the Defendant's letters in support

24   of the sentencing.  I received Mr. Sargent's mother's

25   letter, which I've paid close attention to, on how this

1    situation came about somewhat.

2         I've reviewed Ms. Kerissa Hillard's letter,

3    Mr. Sargent's girlfriend and the mother of your boy, Elon.

4    I've reviewed Mr. Paul Sargent's letter, his brother, in

5    support of him and his background and conduct as well as

6    Troy Sargent, Jr.'s, letter, his oldest son, who is

7    attending college at this time.

8         Additionally, there's a series of pictures of

9    Mr. Sargent and his child and then a family picture of all

10   together.  I have reviewed the *Hamner* case held before Judge

11   Amy Berman Jackson of this court in September of this year,

12   where she discusses the objections to the presentence report

13   that we'll discuss.

14        And obviously, I'm going to make a decision after

15   I hear counsel briefly on the objection to the presentence

16   report, which is not a factual objection, but a legal

17   objection as to the proper sentencing guideline that should

18   apply and how they should be interpreted in this matter.

19        And obviously, the Court in this sentence has to

20   be concerned with the Title 18, 3553(a) factors that we'll

21   address.

22        But the total offense level by the probation

23   office was 17, with a Criminal History Category I.  Despite

24   various issues, criminal issues that Mr. Sargent had, they

25   don't amount to increasing his criminal history.  Under her

1     calculations for the various counts, he's pled -- six counts

2     he's pled guilty to after they're combined.  But his

3     sentence recommended was a guideline range of 24 to 30

4     months as a 24-month sentence, with the others being

5     concurrent to that.  That is by her findings, which as I

6     said has been contested by counsel.

7            Additionally, Mr. Sargent would be entitled to,

8     whatever the sentence is going to be, approximately a

9     two-month credit for the time he's served to date since I've

10    had to revoke his bond because of his continued use of

11    cocaine.

12           So with that, let me start with the issue that we

13    have to discuss from the sentencing memorandum of the

14    Defendant, who raised the issue that the correct guideline

15    basically is obstructing or impeding officers.  The

16    aggravated assault guideline is incorrectly assessed because

17    of the way the guidelines read, taking sort of the approach

18    that Judge Jackson did, basically, in her case.

19           So let me hear from counsel on that first and

20    we'll make a decision on that so we can then understand

21    where we are on the guidelines.

22           So if counsel for the Defendant would come up,

23    Mr. Hanye, and talk about that and see where we go after

24    that issue.

25           MR. HANYE:  Thank you, your Honor.

1          THE COURT:  Thank you.

2          MR. HANYE:  So the assault statute, 111(a), goes

3     to both the obstruction guideline and the aggravated assault

4     guideline.  And then the question becomes just whether

5     aggravated assault applies or not.

6          The only way that aggravated assault could even

7     theoretically apply in this case is when there is sufficient

8     evidence to show that Mr. Sargent committed the assault with

9     the intent to commit another felony.

10         THE COURT:  That's right.

11         MR. HANYE:  Section D in the commentary.

12         THE COURT:  Right.

13         MR. HANYE:  And in the memo, I raised a different

14    issue than what was presented to Judge Berman Jackson on

15    that issue.  And that's the difference between the

16    commentary and the guideline itself.  That's where I'd like

17    to start, because they're completely different.

18         Whether it's above the line or whether it's below

19    the line matters, because it depends on the authority that

20    the Sentencing Commission had to promulgate a guideline

21    versus commentary.  And I didn't mention this in my memo,

22    but I should have:  The difference in authority comes from

23    the statute itself that deals with the guidelines, 28 USC

24    944, which says that the Sentencing Commission -- in which

25    Congress delegates to the Sentencing Commission authority to

1    promulgate guidelines.  And it also has a subsection on

2    policy statements, but it says nothing about commentary.

3          That's what underlies the decision in *Kisor versus*

4    *Wilkie* about how to apply our deference.  It's also what

5    underlies the Third Circuit's decision in the *Banks* case

6    about commentary within the fraud guideline.

7          So there's a significant difference --

8          THE COURT:  So your position is commentary is not

9    to be given any credit like an administrative agency's

10   interpretation of its --

11         MR. HANYE:  Not that it's never to be given any

12   credit --

13         THE COURT:  -- rules?

14         MR. HANYE:  -- but that the tests under *Kisor*

15   *versus Wilkie* about when it should be given deference aren't

16   met in this case.  And there's several steps that the Court

17   has to go through before deciding whether to give some

18   deference to the agency that interprets its own regulation.

19         Before giving any credit or authority to the

20   commentary, there are several steps.  The first is whether

21   the guideline itself or -- you know, which is the regulation

22   at issue in this case -- whether that is genuinely

23   ambiguous.  And *Kisor versus Wilkie* is the case where the

24   Supreme Court says clearly you don't determine genuine

25   ambiguity just by reading the statute, that you have to use

1      the traditional tools of statutory construction before you

2      decide whether there's genuine ambiguity.

3              And those tools include reference back to the

4      statute that the regulation or the guideline is trying to

5      interpret.

6              So this guideline, 2A2.2, and also 2A2.4, are both

7      applying 18 USC 111, the assault on an officer statute.  So

8      we look back at the statute.

9              THE COURT:  Right.

10             MR. HANYE:  This is the first-level step of

11     whether it's even ambiguous using the traditional tools of

12     statutory interpretation.

13             If you look at 111(a), there's three levels of

14     punishment within it.  There's simple assault, which is --

15     the punishment is not more than a year; then there are two

16     circumstances when the punishment can be up to eight years.

17     And that is when there's physical contact or when there's

18     intent to commit another felony.

19             Now, those are two different levels of punishment,

20     but they're within the same subsection.  They're within

21     Subsection (a) of 18 USC 111.

22             Subsection (b) has a clear title to it that says

23     Enhanced Penalty, where the max jumps up to 20 years.  That

24     applies to cases where there is bodily injury or use of a

25     dangerous weapon.  So Congress set out degrees of assault;

1    but the guideline, the commentary to the guideline, does not

2    follow those same degrees.  In some ways they do.  So

3    there's four possibilities of when an assault can be

4    considered an aggravated assault under the commentary to the

5    guideline in Subsection (d) -- excuse me -- that's (a), (b),

6    (c) and (d).

7            The first three all track the division Congress

8    made within the statute.

9            THE COURT:  Right.

10           MR. HANYE:  Then the intent to commit another

11   felony is really an outlier in the way they equated it to

12   cases that involve bodily injury, use of a dangerous weapon

13   or strangulation, which is really just a specification of

14   bodily injury.

15           So they took it from the middle level that

16   Congress put it into with physical contact within the

17   statute, and then made it into the most serious level.

18           So the defense's argument is:  When you try to

19   interpret what does "aggravated assault" mean, first you

20   look back to the statute itself.  And you can see what

21   aggravated assault is because it's in the enhanced penalties

22   section, which is Subsection (b).

23           Even if the Court disagreed with that and decided

24   that this is a genuinely ambiguous guideline about what

25   constitutes aggravated assault, the Court still has to make

1   sure that the interpretation within the commentary is

2   reasonable.  And for the reasons I've already argued, I'd

3   say it's not reasonable.  It's not reasonable to say that

4   intent to commit another felony is just as serious as

5   causing bodily injury or using a dangerous weapon or

6   strangulation.  It's just simply not -- the harm of those

7   first three is more serious than something that involves an

8   intent to commit another felony.

9          That's the argument that was not presented to

10  Judge Berman Jackson, that simply there is no valid

11  definition that would apply to make this an aggravated

12  assault that --

13         THE COURT:  So you're saying it a little

14  differently than I understood your original argument.  So

15  you're saying basically the fact that he pled guilty to

16  Count 1 and Count 2 doesn't solve the problem about not --

17  about intent to commit another felony because the guideline

18  commentary is inappropriate and can't be followed?

19         MR. HANYE:  That's right.  That's exactly right,

20  as to intent to commit another felony.

21         THE COURT:  All right.

22         MR. HANYE:  I can certainly see the argument of

23  how the other three definitions track what's in 111(a) so

24  they could be seen as reasonable, but it's simply not with

25  intent to commit another felony.

1          THE COURT:  Because in Judge Jackson's case, there

2    was not that intent.  There was a difference.  He had not

3    committed another felony.

4          MR. HANYE:  Well, he had not pled -- there wasn't

5    another felony that he had been found guilty of.  But of

6    course that's not the test because it's relevant conduct

7    that can apply without a conviction.

8          THE COURT:  He could have been found -- you're

9    talking about double-counting, really, and --

10          MR. HANYE:  Right.  Right.

11          On this argument, on the argument that the

12    commentary is not authority that the Court can follow in

13    this case, *Banks* from the Third Circuit is really on point

14    on this, because if you read the commentary of the fraud

15    guideline, it says:  Loss includes intended loss.  It's the

16    greater of actual loss or intended loss.  It's right there

17    in black and white.

18          But the Third Circuit said:  Well, that's not

19    where we start because it's in the commentary.  We have to

20    first decide:  Is the guideline itself ambiguous?  And they

21    decided that the use of the word "loss" within the guideline

22    is not reasonable to include intended loss.  So it's right

23    there in black and white.  But the Third Circuit said that

24    loss cannot include intended loss for exactly this argument

25    that I'm making.

 1          And I think it's quite similar to Mr. Sargent's

 2    case.  Both rely on intent.  Both definitions that the

 3    Sentencing Commission tried to put into the commentary or

 4    did put in the commentary are intent-based, intended loss

 5    and intent to commit another felony, neither of which

 6    matches up with the authority that --

 7          THE COURT:  Let me ask you -- I'm just reviewing

 8    the notes here.  The guidelines commentary can be considered

 9    authoritative, right?

10          MR. HANYE:  It can.

11          THE COURT:  The Supreme Court in *United States*

12    *versus Stinson*, which I have now.  So the commentary of the

13    guidelines manual is interpreted to explain a guideline as

14    authoritative unless it violates the Constitution or a

15    federal statute or is inconsistent with or a plainly

16    erroneous reading of that guideline.

17          And so you're saying the Third Circuit went off on

18    its own.  I'm trying to understand how the Third Circuit got

19    there.

20          MR. HANYE:  So *Stinson* is not the latest case that

21    addresses how courts should give deference to agencies

22    interpreting their own regulations.  It's certainly an

23    important case, but *Kisor versus Wilkie* is the most recent

24    case that really limits the way that courts can give that

25    deference and is explicit about the steps that the Court has

1    to go through first.

2            And the Third Circuit in *Banks* -- I don't think

3    they went on their own -- out on their own way.  What they

4    did was they followed *Kisor versus Wilkie*.  If that case

5    didn't exist, they might have reached a different result

6    under the test laid out in *Stinson*.  But it is different.

7    That's where you have to determine, is it --

8            THE COURT:  Well, *Kisor versus Wilkie* was not the

9    guideline case.  Right?

10           MR. HANYE:  No.  It's about a different agency's

11   regulation.  But it applies.

12           THE COURT:  Didn't *Stinson* carve out the

13   guidelines a little differently?

14           MR. HANYE:  I don't see that in *Stinson*.  I see

15   *Stinson* addressed the guidelines, but I think the test is

16   still the same about deference to an agency interpreting its

17   own regulations.

18           And for what it's worth, that's what the Third

19   Circuit --

20           THE COURT:  I do have a note here.  *United States*

21   *versus Moses*, the Fourth Circuit case, a recent one:  After

22   considering the distinct context and actual holdings of

23   *Stinson* and *Kisor*, we conclude that even though the two

24   cases addressed are analogous, circumstances in *Stinson*

25   nevertheless continues to apply when the Courts are

1     addressing guidelines commentary.

2              And the Fifth Circuit in another case, called

3     *Lagos*, said the same thing and quoted *Stinson* again rather

4     than *Kisor;* and *United States versus Lewis*, from the First

5     Circuit, finding *Kisor* did not prevent the application of

6     *Stinson* to the Defendant, granted to guidelines -- granted

7     deference to the guidelines commentary.

8              There is one difference; and that's *United States*

9     *versus Nasir*, N-A-S-I-R, the Third Circuit case, 17 F.4th

10    459, which applied *Kisor* to the deference to be given to the

11    commentary of the guidelines.

12             Our circuit doesn't have it.  It's not decided

13    that yet.

14             MR. HANYE:  I hear the differences in those cases.

15    It appears there is a difference in the way circuits have

16    decided how to apply *Stinson* and *Kisor* to the guidelines;

17    and certainly we would urge the Court to follow the Third

18    Circuit and the way that *Kisor* is applied for all those

19    reasons about how intent to commit another felony in the

20    commentary is divorced from the scheme that Congress itself

21    laid out in the statute itself.  And that's one argument as

22    to why the obstruction guideline should apply.

23             There's a completely separate argument as well,

24    which is the one that was persuasive to Judge Berman

25    Jackson.

1          THE COURT:  I'm not convinced on your first

2     approach, but I see problems under Part D because of

3     Mr. Sargent's conduct in Count 2 and the intent to commit

4     another felony in Count 1, where you contend that basically

5     it's the same offense.  You don't have another independent

6     felony.

7          MR. HANYE:  That's right.  It's not

8     distinguishable conduct.  The problem there is then it

9     doesn't distinguish between cases.  And the way Judge Berman

10     Jackson phrased it is that the test should not be a

11     hypertechnical alignment of elements because the result is

12     that it strips the provision of any meaning.

13          THE COURT:  What about Judge Friedrich's decision,

14     the *Creek* sentencing?

15          MR. HANYE:  I understand that in *Creek*, it was

16     agreed to, that the enhancement was agreed to.  So it

17     wasn't -- the issue wasn't presented to the Court for

18     decision in the same way.

19          THE COURT:  They didn't dispute the higher

20     guideline range in the plea agreement in her case and they

21     didn't have an objection to the plea agreement and its

22     application there.

23          MR. HANYE:  But there's another way to look at

24     this, Judge, which is the Government I don't think made this

25     explicit, but Probation did in the presentence report.  You

1    could, as in Judge Berman's Jackson case, have a *Hamner*

2    decision, have a conviction for civil disorder, and you have

3    the same question:  Does that count for aggravated assault

4    because there was another felony?

5           And so Probation's position is that the other

6    felony for the assault is the civil disorder and the other

7    felony for the civil disorder is the assault, and we just go

8    around in circles.

9           THE COURT:  I agree.

10          MR. HANYE:  And that's perhaps the most succinct

11   way to say that that means it can't apply because it's not

12   really separate, because the cases where intent to commit

13   another felony is distinguished and have been upheld is when

14   there's clearly a separate felony.  I cited a couple of

15   cases within this circuit where the facts were about an

16   assault but it was clear that there was an intent to commit

17   a sexual assault, a separate sexual assault, or possession

18   of a gun.

19          There's also an intent to use --

20          THE COURT:  Use the gun.

21          MR. HANYE:  -- or an assault on an officer, I

22   think commonly to escape whatever the underlying offense

23   was.  That's not what happened here.

24          THE COURT:  Well, an assault on a bank guard to

25   rob a bank.

1          MR. HANYE:  Exactly.

2          THE COURT:  And what's addressed here in assault

3   with this man where he's pled guilty to attempt to interfere

4   with the election process of Congress?

5          MR. HANYE:  Because -- well, it's not that he

6   actually hasn't -- I think there's an important distinction.

7   He hasn't pled guilty to interfering with the election

8   process.  He pled guilty to civil disorder, which the

9   elements of civil disorder don't actually require a specific

10   intent to commit a civil disorder.  They require an

11   intentional act and an awareness of a civil disorder, but

12   it's different than the hypothetical the Court proposed for

13   that reason.

14          THE COURT:  Interesting.

15          I do think it's a problem the guidelines have

16   identified, and I think courts are going to go different

17   ways on it.

18          So I'll hear from the Government briefly on this

19   and then we'll get back to the regular sentencing.

20          For those who are attending the sentence either

21   through the phone or in person, the Court has to decide the

22   guidelines that apply properly to determine the appropriate

23   range of sentences.  And I've been presented with an

24   argument that the guidelines should be much lower, that the

25   lower guideline range would be a maximum of 14 months in

1    prison as opposed to 24 months.

2              MR. ROMANO:  Thank you, your Honor.

3              THE COURT:  Mr. Romano.  Go ahead.

4              MR. ROMANO:  I'll start with addressing the

5    argument about the application of 2A2.2 instead of 2A2.4.

6              THE COURT:  All right.

7              MR. ROMANO:  The Government submits that the

8    defense argument is wrong in a number of respects.

9              So the defense claims that the term "aggravated

10   assault" is ambiguous and doesn't cover an assault with

11   intent to commit another felony, but they don't supply an

12   alternate definition.  The Government submits that to the

13   extent that this phrase has a common legal understanding, we

14   can look at a law dictionary like *Black's*.

15             And looking at the 11th Edition of *Black's Law*

16   *Dictionary*, published in 2019, *Black's* definition of

17   aggravated assault is criminal assault accompanied by

18   circumstances that make it more severe, such as the intent

19   to commit another crime or the intent to cause serious

20   bodily injury, especially by using a deadly weapon.

21             So that common legal understanding of the phrase

22   tracks with the commentary to the guidelines.  It's normal

23   to have phrases like this defined.  I don't think aggravated

24   assault is the most ambiguous of phrases, but it certainly

25   needs definition, especially given the number of statutes in

1    the federal system, but also in state systems that talk

2    about aggravated assault, and there might be slight

3    differences from place to place.

4         So that is a reason to consider the phrase's

5    having some ambiguity and needing definition, so it's

6    appropriate to refer to the guidelines and the commentary

7    therein and give weight to that.

8         I also think the defense's argument about reading

9    2A2.2 and 2A2.4 in the context of Section 111 and using the

10   Statute 111 to define the guidelines term is erroneous

11   because 2A2.2 and 2A2.4 are regulations implementing 111.

12   The sentencing guidelines are meant to cover a variety of

13   criminal statutes; and in fact, a quick look through the

14   statutory appendix, which cross-references statutory

15   provisions, two parts of the guidelines, shows that there

16   are multiple different statutes, not just 18 USC 111, which

17   can lead to sentences under 2A2.2 or 2A2.4.

18        So it's not like this one statute is the only

19   statute that those guidelines apply to or are seeking to

20   implement.

21        Also, considering their argument about the

22   structure and purpose of 111 that intent to commit another

23   crime is less serious than assaults involving weapons,

24   assaults involving injury or assaults involving

25   strangulation, the Government agrees.  It appears the

1    Guidelines Commission agrees, because when you go from 2A2.2

2    to -- or 2A2.4 to 2A2.2 and you look at the aggravated

3    assault guidelines, there are sentencing enhancements, there

4    are increases to the offense level for use of a weapon and

5    there are several different gradations, depending on the

6    type of weapon.  There are increases to the offense level

7    for injury and there are again several gradations, depending

8    on the type injury, and there's another increase to the

9    offense level for strangulation or suffocation.

10           So the authors of the guidelines collectively

11   viewed assaults involving weapons, assaults involving injury

12   and assaults with the intent to commit another felony as

13   more serious than instances of obstructing officers that

14   didn't feature any of those characteristics.  That's the

15   reason for the cross-reference.

16           And then further, they viewed, as the defense does

17   and as the Government does, offenses involving weapons and

18   injury as yet again more serious than offenses involving the

19   intent to commit a felony, which do not feature weapons and

20   injury.

21           For all those reasons, your Honor, the Court

22   should apply the guidelines' cross-reference and should

23   consider the cross-reference as informing how to evaluate

24   whether 2A2.2 or 2A2.4 applies.

25           I will turn now to speak about the opinion that

1    Judge Berman Jackson issued and the Court's questions about

2    that.  The Court highlighted in the *Creek* case, Judge

3    Friedrich found it appropriate to apply 2A2.2, noting that a

4    violation of the civil disorder statute and a violation of

5    the assault-on-officer statute were different felonies.

6          Now, as the defense noted and as the Court noted,

7    there was a plea agreement there.  The defense wasn't

8    contesting the application of 2A2.2.  Nonetheless, the Court

9    does have an independent obligation to find that the

10   guidelines are correct and to determine what guidelines

11   calculations apply.  So we disagree with the defense's

12   assertion that this issue wasn't before the Court and

13   perhaps was not fully briefed or not fully argued, but Judge

14   Friedrich did determine that that provision of the

15   guidelines applied.

16         Likewise, in -- I believe it was the *Leffingwell*

17   case, Judge Berman Jackson, going in the other direction

18   from evaluating a 111 charge, found that the cross-reference

19   applied.

20         The *Hamner* case notably goes in a different

21   direction, looking at the guidelines for 231 and considering

22   whether intent to commit another felony can elevate those to

23   2A2.2 when the other felony is an assault.

24         I certainly hear the Court's concern about the

25   possibility that the definition is circular and what the

1    Government is seeking to apply is circular.  But it's also

2    worth noting that the conduct that the guidelines talk

3    about, where the conduct shows an intent to commit another

4    felony, is relevant conduct.  It's not just the facts that

5    make the elements at the moment the crime is committed.

6            Here, what we have for relevant conduct is not

7    just the moment that the Defendant stepped out of the crowd

8    and tried to strike a police officer, but it's all of the

9    relevant conduct and what the Defendant would have perceived

10   at the Capitol on January 6th.

11           And what the Court has seen from the Government's

12   sentencing submission is that the Defendant made his way to

13   the center of the lower west terrace, that at some time --

14   we don't have the exact time -- he scaled the media tower in

15   the middle of the lower west terrace and he was able from

16   there to see the police line from an elevated view.  He was

17   able to see the police clash with other rioters.

18           And then at some point, he made a conscious

19   decision after seeing violence that he wanted to be part of

20   that violence and climbed down from the media tower.  He

21   moved to the front of the crowd and then he tried to strike

22   police officers.

23           So at a minimum, if the Court is concerned that

24   the Government's reasoning is circular, he certainly

25   committed an assault with intent to participate in a civil

1   disorder, because at the time of the assault, he understood

2   well that the civil disorder was happening.  Although we

3   don't have concrete proof, he likely saw the rioters break

4   the police line right about the time that he got down from

5   the ladder because that happened about two minutes before

6   his assault.

7        And so we think that the knowledge there is clear

8   that for 111 purposes he certainly acted assaulting an

9   officer with an intent to join in the civil disorder and

10  resist police in the manner articulated in the statute

11  there.  He intended to commit that other felony.

12       Because these are two distinct charges that have

13  distinct elements that satisfy the *Blockburger* test, and

14  based on the totality of the Defendant's conduct and the

15  circumstances, we believe the cross-reference is appropriate

16  to apply to both charges.  But if the Court were to find it

17  is only appropriate to apply to one charge, the Government

18  submits that the sentencing guidelines calculation would

19  nonetheless be the same because the counts would group

20  together, and so the higher of the guidelines provisions

21  would drive the sentence here.

22       And I'm happy to answer questions if the Court has

23  any, but that's the end of my argument otherwise.

24       THE COURT:  You distinguished the *Hamner* case for

25  me, Judge Jackson's decision.  Why is it distinguished?

1          MR. ROMANO:  In part because Judge Jackson was

2    looking at 231 in assessing whether in committing a civil

3    disorder the Defendant was acting with the intent to also

4    commit an assault.  And that's different from the

5    circumstance we have here that, granted, that is a question

6    for the Court because the Defendant did plead guilty to a

7    civil disorder charge here.

8          But we argue certainly when the Defendant

9    committed an assault in this case, he acted with the intent

10   to commit a civil disorder.  So that is a different question

11   from the one that Judge Berman Jackson was presented.

12         I confess as far as the factual circumstances in

13   *Hamner* and what Hamner would have perceived about the crowd

14   before taking the action that resulted in the civil

15   disorder, I'm not informed well enough to be able to parse

16   that.

17         But given the circumstances here, the Government

18   submits that these circumstances allow the Court to find

19   that the Defendant committed both acts with the intention to

20   commit another felony.

21         THE COURT:  Thank you for that.

22         The Court's going to rule on this guideline issue

23   as to the appropriate guideline range that should apply

24   that's been preserved through the objection of counsel.

25         The Government had no objection to the presentence

1       report.

2             The Defendant only objects insofar as the

3       resolution of any factual matters that the contention of the

4       Defendant that the guideline 2A2.2 for aggravated assault

5       doesn't apply because Mr. Sargent committed the assault with

6       intent to commit another felony because they're matters that

7       counsel for the defense has raised today both as to the

8       guideline issue or the history they gave us of the

9       guidelines and that it should not be applied in the -- not

10      only for the circular argument that he mentioned, but more

11      so as a general attack on the guideline not being

12      appropriate based upon reference to the definitions in

13      Section 111.

14            And that would make it inappropriate to assess the

15      additional points against the Defendant if you follow that,

16      because it's not to be an aggravated assault; it should be

17      an obstruction of a police officer, 2A2.4.

18            I don't agree with the Defendant.  I think it's a

19      very challenging argument, the first time it's been

20      addressed to this Court.  I believe there are distinctions

21      in this case in some areas from Judge Jackson's *Hamner* case.

22      Obviously, he did plead here to Count 1.

23            But beyond that, I think that the argument,

24      frontal attack on the commentary under the Supreme Court

25      cases that he referred to, I think the majority of the other

1    circuits that have approached this, the overall weight of

2    the decisions to date have not determined that -- I'll get

3    the cite of the case here in a second -- has not determined

4    that the Supreme Court case has meant that the guidelines'

5    commentary have no weight or deference to be given to them

6    in their interpretation.

7           The Defendant argued that basically *Kisor versus*

8    *Wilkie* should control the reading of the commentary and what

9    weight it should be given.  That's *Kisor*, K-I-S-O-R, *versus*

10   *Wilkie*.  The Court should follow, basically, its own

11   legislative rules unless the regulation is genuinely

12   ambiguous under *Kisor*.

13          And I agree with counsel as to how those circuits

14   have commented on it, on the guidelines.  And the majority

15   of the circuits all have decided that the guidelines are

16   authoritative unless it violates the Constitution or a

17   federal statute or are consistent with a plainly erroneous

18   reading of the guidelines under the *Stinson* case.

19          The only case that disagrees so far we've found is

20   the *Nasir* case in the Third Circuit that applied *Kisor* to

21   the determination level of deference given to the commentary

22   of the sentencing guidelines.

23          In D.C., the only thing we could find is the D.C.

24   Circuit found when a court is interpreting commentary to a

25   policy statement in the guidelines, the commentary is

1    binding to the extent it reasonably interprets the policy

2    statements.  *United States versus Jenkins*, 50 F.4th at 1196,

3    a 2022 case.

4            I think, consistent with both the weight of the

5    authority and the Supreme Court's binding authority, I

6    think, in *Stinson*, I'll find the definition of aggravated

7    assault found in the commentary is appropriate under 2A2.2.

8    And I think the commentary has to be given appropriate

9    weight and is not overruled by *Kisor*.  So I'll defer to that

10   definition.

11           And then whether or not Mr. Sargent's conviction

12   qualifies under that definition -- and again, the aggravated

13   assault was determined to be a felonious assault that

14   involved a dangerous weapon, serious bodily injury,

15   strangling, et cetera, or intent to commit another felony.

16           The Defendant interpreted (d), that last one, as

17   inappropriate because he said it didn't fit the

18   interpretation of 111.

19           Counsel for the Government said no, there are

20   overall other statutes that also it follows as may be

21   appropriate and that the cross-reference is appropriate on

22   the aggravated assault because it's not bound by only 111.

23   It refers to other statutes that may apply, too, and it does

24   fit those other statutes that apply.

25           And I had a concern that on intent to commit

1       another felony and whether it's circular, that it had to be

2       the same exact action.  We discussed that with counsel on

3       both sides.

4              There's really nothing defining the meaning of the

5       intent to commit another felony in context over the

6       application of the aggravated assault guidelines.  The only

7       thing we have in our court is *United States versus Hamner*,

8       that is the Judge Jackson case, where the Defendant pled

9       guilty to the aggravated assault and she gave a lower

10      valuation because she believed that it had -- that was a

11      concern of how it could be properly read using the same

12      offense twice, the circular argument.

13             And Judge Jackson said that the same condition --

14      the same conduct underlies both offenses.  There is no

15      intent, then, to commit another felony.

16             I have come to a different conclusion on that in

17      that there was no plea agreement in that case.  Here, we had

18      not only a plea to Count 2, but a plea to all the counts.

19      And it doesn't seem to me -- in that case also there was

20      some dispute about whether the Government demonstrated

21      physical contact as part of the 111(a) charge.

22             And here, I think the *Creek* case may be more

23      appropriate to follow, although again it's not exact, that

24      Judge Friedrich said the Court should apply the aggravated

25      assault guideline as the felonies contained distinct

1    elements.  There, they had a plea agreement.  And some

2    argument has been made that the plea agreement separates it,

3    because there there was no disputing the guideline range

4    potentially.

5          But here, we have the same thing in the sense that

6    there's no plea agreement.  We have a plea to Counts 1 and

7    2.  And Judge Jackson felt in her case that the lack of a

8    plea agreement was the distinguishing factor being the

9    factor in *Creek* and *Hamner*.

10          Here, we don't have a plea agreement.  He pled to

11   all the counts of the indictment.

12          So the Court's going to disagree with the argument

13   of defense counsel, although I think it is a concern and

14   that is a new approach to how you interpret the guideline

15   range of 2A2.2 and 2A2.4.

16          But here, we really have an aggravated assault.

17   We do not have just the obstruction of a police officer.  It

18   seems to me the underlying conduct is clear and that

19   obviously he had -- if you go back through Mr. Sargent's

20   statements prior to coming down to the riot, to his joining

21   the riot, climbing up the platform or the media tower,

22   viewing what he saw, that he then said he was coming down

23   and joining in eventually or coming -- that he came down,

24   moved to the front of the line through a huge crowd and he

25   assaulted the police officer.  There's no question about

1   that.

2          And then later he tried to do it again, but

3   missed.  But in between the swings, the officer instructed

4   him and others when he was there to stop attacking, not --

5   instructed him not to start attacking people.

6          The Defendant did it again anyway.

7          It seems to me that he did have the intent to

8   commit a separate offense, felony, and that is interfering

9   with the process of Congress approving the Electoral College

10  vote, and engaged in civil unrest to do that.  It seems to

11  me that had to be part of his operation at that time.

12          So I am going to rule against the Defendant for

13  those reasons in that he attempted felonious assault, an

14  aggravated assault, in an attempt to commit another felony.

15  And that is a civil disorder offense.

16          That would mean I'm going to find the guideline

17  range that pertains to this case is the level of 17,

18  Criminal History Category I.  Under the guidelines, there's

19  an exposure of 24 to 30 months on Count 1.

20          And on Count 2, I think that the parties

21  understand the guidelines are advisory and not binding on

22  the Court.  And therefore, I'll hear from counsel now from

23  the defense as to the appropriate sentence that can be

24  imposed in this matter, recognizing I have determined the

25  guideline range, but they're advisory.

1          MR. HANYE:   Thank you, your Honor.

2          So having determined that the higher guideline

3     applies here, I think what that does is it just creates an

4     even stronger distinction between Mr. Sargent's conduct and

5     other cases that I think even more clearly constituted

6     aggravate assault.  So I'm going to argue that it does --

7     all the differences, all the 3553(a) factors in this case,

8     now support a significant downward variance.  Based on our

9     guidelines argument, we're asking for a moderate one.  But I

10    am still going to recommend six months for Mr. Sargent

11    because of the specific 3553(a) factors.

12          He's here, obviously, because of his very poor

13    choices.  He chose to swing at an officer during a civil

14    disorder.  It's a serious offense, one that he's

15    acknowledged by pleading guilty and by recommending a term

16    of incarceration.

17          But Mr. Sargent also made other choices that are

18    relevant, that certainly matter to what an appropriate

19    sentence here is.

20          It matters that he swung with an open hand as

21    opposed to a fist.  It matters that he did not bring weapons

22    of any kind when many other people guilty of same offense

23    brought weapons.  And it matters that after he did take

24    those two swings that he decided to leave.

25          And I would ask the Court to consider the mob

1    mentality that was in existence at that point where there's

2    many hundreds of people pushing against the officers, some

3    nearby to where Mr. Sargent was, who were using weapons; and

4    yet, while this is going on, Mr. Sargent makes a different

5    decision.  Viewing his conduct to that point, I think we

6    would have expected he would have made that worse.  And yet

7    he didn't.

8         So that reveals something important about

9    Mr. Sargent.  He crossed a line, but he did not continue to

10   cross lines in even more serious ways.

11        And the reason that that matters is because, had

12   he kept going, had he swung with a fist or had he brought a

13   weapon with him, had he caused bodily injury at this point,

14   he would have wound up with the same guidelines that the

15   Court is applying here.

16        And so the only way the Court can take account for

17   those meaningful differences is by -- is through a downward

18   variance based on the specific facts, the nature and

19   circumstances being one of the 3553(a) factors.

20        While the Court should consider all the choices

21   that Mr. Sargent made, we'd also ask the Court to consider

22   the changes that he's made since then.  It's now been nearly

23   two years since January 6th of 2021.  The Court has before

24   it four letters from close family members, his mother, his

25   brother, his girlfriend and his 18-year-old son.  And they

1   all describe the same change in Mr. Sargent.  They say he's

2   quieter, calmer; he's more tolerant of people with different

3   opinions than him.  He has expressed sincere regret to all

4   of them.  It's not just what he's saying in public to the

5   Court, but it's in private to those closest to him.

6          And I would suggest that those important changes

7   are consistent with his decision to not go further, that

8   there appears to have been something in Troy Sargent that

9   realized that he committed a crime and that this was getting

10  out of hand and he needed to step back.  Certainly we wish

11  and he wishes he would have made that realization much

12  earlier.  But it still matters in that particular context,

13  that he did.

14         And, yes, the Government will argue that he made

15  some arrogant and boastful and exaggerated claims after

16  January 6th, that it wasn't immediate.

17         THE COURT:  Right.

18         MR. HANYE:  And those matter.  Those are relevant.

19         But I would say they don't carry the same weight

20  as the change that he has shown in person through actions to

21  people over the last 18 months.

22         THE COURT:  How about his interview with the FBI

23  several weeks later or months later?

24         MR. HANYE:  He was scared.  He -- first, he did

25  express regret in that interview.  He said he did not -- he

1    wished he had never gone.  There were moments knowing that

2    he was facing consequences that I'm sure he was motivated to

3    try to minimize that.

4            And accepting responsibility, truly accepting

5    responsibility, is a process.  Even so, even being scared,

6    facing the consequences upon his arrest, he still says:  I

7    wish I had never gone in the first place.

8            The guidelines, just like they don't account for

9    all of his specific behavior, they don't account for those

10   changes.

11           There are other positives about Mr. Sargent that

12   we'd ask the Court to consider:  Those letters from his

13   family and also the conversations that his girlfriend and

14   his mother had with Ms. Field, who wrote the presentence

15   report, they talk about the positive role that Mr. Sargent

16   plays in his family and his community as a person who could

17   spend all day fixing anybody's car without getting paid for

18   it; that he feeds homeless people in his community; that

19   he's had a cookout for people who are hungry and in need.

20   And that's important because that's not just handing out

21   food, but that's creating a social interaction for people

22   who need that kind of support.

23           Mr. Sargent has done a great deal of work

24   renovating his mother's 100-year-old house.  He's a very

25   loving and dedicated father to his 18-month-old son.  In

1    fact, he was the primary caretaker during the period of his

2    pretrial release because his girlfriend was the one who was

3    employed regularly at that time.

4          The role that he plays in his family, the great

5    support they show for him, matters because they will be

6    there to help him reintegrate into society.  And so I think

7    that suggests a much lower risk of recidivism.

8          THE COURT:  How much do I treat the drug addiction

9    as a problem?  Before, he got out and it got worse rather

10   than better.  I had to put him in prison again.

11         MR. HANYE:  So I think that the Court and

12   Probation should continue to treat it as a treatment issue.

13   Mr. Sargent did attend various forms of treatment and he

14   even completed some at times.  And he had periods where he

15   did maintain his sobriety.

16         So he should get treatment.  He should be tested.

17   And there should be a condition that allows Probation --

18   it's generally at least in our district treatment at the

19   direction of the probation department so that it's in place

20   should it be necessary.

21         I also in my experience with Mr. Sargent -- I

22   think that the unknown of what was going to happen here was

23   a great stress and caused great anxiety.  I'm hopeful that

24   with this resolution, whatever the Court decides, that at

25   least he can put that behind him and move forward.  I think

1    he has after better --

2              THE COURT:  I will say, he was very honest about

3    it.

4              MR. HANYE:  Yes.

5              THE COURT:  He always said if he was using drugs

6    or not.  But it got to be a problem for him that he couldn't

7    control and we couldn't control, despite the threat of jail.

8    He's now had a couple of months in a difficult situation,

9    particularly the movement lately and being in D.C. Jail for

10   a while.

11             MR. HANYE:  Right.

12             And his acceptance of responsibility is not just

13   pleading guilty, but turning himself in, which the Court

14   told him to.  He certainly didn't want to.  That was

15   difficult for him.  But he knew that that was what he needed

16   to do.  Other people make different choices, bad choices, in

17   those circumstances.

18             So we'd ask the Court to consider the consequences

19   that Mr. Sargent has already faced, that he's going through

20   now, that great relationship he has with his family.  That's

21   the source of, I would say, the greatest consequence that

22   he's feeling right now.  This is the first time he's had to

23   be away from them.  He's been forced to be away from them.

24             This was a man with some prior court involvement

25   but with zero criminal history points and somebody's who's

1    not used to incarceration.  He has not become in any way

2    numb to it.  So the sting of it matters.  And it matters

3    because it accomplishes important sentencing goals like

4    punishment, like deterrence, like promoting respect for the

5    law.

6         He's feeling it.  And as the Court noted, it's

7    particularly harsh because of the necessity of having him to

8    go from Western Massachusetts to Rhode Island to Oklahoma to

9    Virginia to here and then he's -- I understand he's going to

10   go back to Northern Neck in Virginia for probably at least

11   another month until he gets designated by the BOP.

12        THE COURT:  So he's been in Northern Neck until

13   now?

14        MR. HANYE:  For the last week or so.

15        THE COURT:  I thought he was in D.C.

16        MR. HANYE:  No.  For whatever reason, he wasn't

17   brought here.

18        THE COURT:  That's actually better.

19        MR. HANYE:  He got up here at 3:00 this morning so

20   he could be here, or they got him up.

21        Now that we're dealing with the guideline of 24 to

22   30 months, which we do object to, but if you compare those

23   to the other cases that applied them, Mr. Sargent's conduct

24   is very different.  Even the Government admits that his

25   assault was less serious than in *Creek*.  I think it's

1    significantly less serious.

2          Mr. Creek had a weapon with him.  He threw an

3    object.  He shoved, pushed, kicked the officers.

4          Mr. Leffingwell, who had the shorter sentence of

5    only six months, even he went into the Capitol itself.

6          So those are important reasons that I would say

7    that when the Court is deciding what's necessary here and

8    what's sufficient, I still am going to recommend the six

9    months for all those particular reasons.

10          A couple of other issues, your Honor:  The

11    Government's asking for $2,000 in restitution.  I addressed

12    it in the memo.

13          THE COURT:  You did.  You don't think there's

14    power for the Court to do that?

15          MR. HANYE:  I don't.  That's my first argument.

16          I also would say that it's clear that Mr. Sargent

17    himself did not cause any damage.

18          And given that he then chose to leave, that his

19    influence on others was not as great as other people who

20    have been ordered the 2,000.  So if the Court has -- is

21    inclined to order restitution, I think it should be less.

22    My argument is there shouldn't be any at all, but it should

23    be less than the 2,000, which I understand has become

24    somewhat of a standard for people who aren't directly tied

25    to damage.

1         And then I would ask for a judicial recommendation

2    to FMC Devens.  It is the only Bureau of Prisons facility in

3    Massachusetts to try to encourage family visitation.

4         THE COURT:  D-E-V-I-N-S?

5         MR. HANYE:  D-E-V-E-N-S.

6         THE COURT:  D-E-V-E-N-F?

7         MR. HANYE:  "S."  Devens.

8         THE COURT:  All right.

9         MR. HANYE:  And so for all those reasons, I think

10   that six months is going to accomplish all the goals of

11   sentencing, your Honor.  Obviously, with two years of

12   supervised release and conditions as well.

13        THE COURT:  All right.  I appreciate the work on

14   the case.  You did an excellent job --

15        MR. HANYE:  Thank you, your Honor.

16        THE COURT:  -- for Mr. Sargent.

17        Mr. Romano, let me hear the Government's position

18   on the sentencing based upon my findings so far.

19        MR. ROMANO:  Thank you, your Honor.

20        Considering all of the factors set forth in 18 USC

21   3553(a), the Government argues that the Court should impose

22   a sentence within the guidelines, that a guidelines

23   sentence, specifically a sentence at the midpoint of the

24   guidelines, which is 27 months, best advances the goals of

25   sentencing.  It will recognize the nature and seriousness of

1    the offense, that it encourages deterrence, that it provides

2    just punishment for the offenses and avoids unwarranted

3    sentencing disparities.

4           Taking first the seriousness of the offense, I

5    know at this point the Court is well familiar with the

6    events of January 6th, 2021.  It bears repeating that of

7    course the events of that day were extremely serious, that

8    it was an attack on the heart of American government by a

9    violent mob.  And the Defendant intentionally joined that

10   mob.

11          He wasn't at the Capitol for as long as some

12   people.  He didn't go into the Capitol.  But as I said a few

13   minutes ago, he was in the west plaza, where there was

14   violence done to police officers who were defending the

15   Capitol by a number of rioters, including him.  He was in a

16   position to observe the fact that the police were wildly

17   outnumbered and were being assaulted by a number of rioters.

18          And his reactions that day and in the days

19   immediately following on social media make it appear that he

20   decided to join in the violence because it looked like it

21   would be fun.

22          There wasn't a greater reason than that.  He saw

23   police deploying teargas and pepper spray.  And I don't

24   remember his exact wording -- I'm paraphrasing -- but he

25   said something like:  After I saw that, I knew I had to

1    climb down off the ladder and get me some.

2          That's reveling in violence for the sake of

3    violence.  The size and force of this crowd wore down police

4    officers over the course of about an hour and a half.  They

5    had to defend the west plaza.

6          He climbed down off the ladder and attacked police

7    officers right after the police line was broken.  This was

8    the moment that forced police to retreat to the lower west

9    terrace tunnel, which was where some of those officers

10   sustained the most brutal and violent attacks of the day.

11         Now, of course, Mr. Sargent was not there.  He

12   didn't go to the lower west terrace tunnel, and we're not

13   saying he's responsible for the actions of those other

14   rioters who did.

15         But his actions and the actions of other rioters

16   were the sort of attacks that wore down police over time,

17   that sustained pressure from other rioters, was what made

18   that retreat necessary.

19         So again, while he didn't break the police line,

20   he very likely saw that it had broken and he chose to join

21   the fray during a moment when police were vulnerable and in

22   disarray.  And that matters.

23         The defense highlights -- and they're correct --

24   that our evidence does not show Mr. Sargent brought weapons,

25   that he used weapons or that he tried to penetrate the

1    building.

2           In fact, from his own cell phone footage, it

3    appears that he was back in his hotel room during daylight

4    hours.  So he may not have stuck around the Capitol much

5    longer than his assault.

6           Those should not be considered as mitigating

7    factors, your Honor, because had he committed a weapons

8    offense, had he injured an officer, had he tried to

9    penetrate the building, he would have been facing higher

10   guidelines ranges.  The range he is facing already takes

11   those factors into account.

12          The guidelines provision under 2A2.2, which the

13   Court has found applies, does have offense level

14   enhancements for the use of weapons.  I'm sure the Court has

15   seen other cases in the January 6th context where there are

16   weapons offenses committed simply as people who used pepper

17   spray, people who throw things at officers.

18          That would probably result in, I believe, about

19   three or four as far as offense levels, had he used a

20   weapon.  And so his sentencing range would be substantially

21   higher.

22          Had Mr. Sargent tried to penetrate the building

23   and get farther to take affirmative action beyond what he

24   did in the west plaza, it's likely he would have faced a

25   charge of 18 USC 1512, which is obstruction of Congress.

1    Assuming that all the enhancements there applied, there is

2    an eight-level enhancement in guidelines provision 2J -- and

3    I forget the exact number, but an eight-level enhancement

4    for the use of violence or the threat of violence to commit

5    obstruction of justice.

6         And I think that the overall offense guidelines

7    level would have been 22 in the case had he been charged

8    with 1512 and his guideline range would have been 41 to 51

9    months.

10        All that is to say, had he taken these additional

11   steps, he would have been facing more time.  And so the fact

12   that he didn't take those steps isn't reason to consider

13   departing below the guidelines.

14        The Court also needs to keep in mind the need for

15   general and specific deterrence.  The need for general

16   deterrence is especially significant in these January 6th

17   cases.  It's significant to send a message to the rest of

18   the country that these crimes were extremely serious and

19   they will be met with punishment and to discourage future

20   lawbreakers from doing so, especially in the context of

21   protecting the integrity of our elections and protecting the

22   peaceful transfer of power.

23        I'm sure it has not escaped the Court's notice

24   that there are people who incorrectly treat the January 6th

25   Defendants like they are being persecuted for their

1     political beliefs, which couldn't be further from the truth;

2     and sending a strong message through sentencing communicates

3     the seriousness of these matters and the criminal nature of

4     these matters.

5            Now, as to specific deterrence, I certainly

6     understand the Court's concern and share the concern

7     regarding recidivism.  The Government is not going to argue

8     that the Defendant's drug problems mean he is likely to

9     reoffend in a similar manner to the offense in this case.

10    But certainly it does raise concerns about recidivism.

11           I also am not going to speak to the family support

12    and the work the Defendant has done to rehabilitate himself.

13    I think that's admirable.  It's something that the Court

14    should take into consideration.  But I'm less well-equipped

15    to address that than Mr. Hanye is.

16           I do want to speak to the issue of unwarranted

17    sentencing disparities and other sentences.  As to the

18    Government's position, the best way to ensure that there are

19    not unwarranted sentencing disparities is to follow the

20    guidelines.  The guidelines already assess differences

21    between different types of conduct.  The guidelines are the

22    best way to ensure sentencing consistency.

23           And it is probably a better approach to look to

24    the guidelines first and assess what they recommend than

25    just to look at comparable cases, because there are a number

1    of January 6th cases that have gone to sentencing at this

2    point, but it is very easy when looking at specific cases to

3    find that the factual circumstances of individual Defendants

4    on January 6th vary a great deal.

5         I'll start first with the other -- I believe it's

6    the *Leffingwell* case.  It is cited frequently by Defendants

7    at sentencing, given the low sentence that Judge Jackson

8    imposed.  And I certainly don't fault them for citing it.

9    But it's the Government's position that *Leffingwell* is an

10   outlier and is not in almost any case an appropriate

11   comparator.  Judge Jackson noted in *Leffingwell* that the

12   Defendant had sustained a traumatic brain injury while

13   serving in the United States military and that time

14   incarcerated would interrupt the Defendant's VA benefits,

15   which would resume after he was incarcerated.

16        I think an examination of that Defendant's

17   particular circumstances and the need to continue receiving

18   care following a brain injury that the Defendant had

19   incurred serving our country certainly weighed heavily on

20   the Court.

21        The Government cites *Creek* in our memorandum

22   because I think *Creek* is the closest case that we have.

23   It's an assault involving unarmed combat, as is the case

24   here.  The Defendant mentioned that Creek used weapons; and

25   the Government, in fact, did argue that Creek used weapons.

1          But as I recall, Judge Friedrich found that he did

2     not.  She did not find the rachet strap that he picked up to

3     actually be a weapon for purposes of the guidelines.  If I'm

4     not mistaken, she applied a lower guidelines range than what

5     the Government was arguing for because of that finding.  I

6     might be mistaken.  It's been a little while since I've

7     looked that deeply at the *Creek* transcript, but I think that

8     is correct.

9          *Creek* happened around the same time, the same

10    location, as this Defendant's conduct here.  I stress that

11    *Creek*, like this case, involved unarmed fighting because

12    there are a number of cases that have gone to sentencing

13    where Defendants have received substantially longer terms of

14    incarceration than what the Government is seeking here,

15    where the Defendants did use weapons.  There have been a

16    variety of different weapons offenses that have gone to

17    sentencing.

18          In contrast, there were just not a lot of cases

19    like this one that involved hand-to-hand but unarmed combat

20    with police officers.

21          And the sentence that the Defendant requests,

22    which is six months, is actually similar to sentences

23    received by Defendants in felony cases that don't

24    necessarily involve assaults.  There are a number of cases

25    where a Defendant has pleaded guilty to civil disorder

1    charged under 18 USC 231(a)(3) or obstruction of Congress

2    charged under 18 USC 1512(c)(2), where Defendants have

3    received sentences somewhere south of a year.  And there is

4    not necessarily assaultive conduct wrapped up there, or if

5    there is assaultive conduct, it's in the nature of resisting

6    officers or being part of a crowd that kind of surges past

7    officers rather than actually trying to strike an officer

8    with your hands.

9          The Government submits that's worse.

10          If the Court is interested, I have the names of

11    some of those cases, which I'm happy to talk through.  But I

12    don't think I need to because I view them as factually

13    distinct from the matter addressed here.

14          THE COURT:  All right.

15          MR. ROMANO:  Given the relative lack of other

16    comparators, that is why, returning to our central point,

17    the Government submits that beginning with the guidelines is

18    the best way to ensure against unwarranted sentencing

19    disparities.

20          THE COURT:  And what about the restitution

21    argument?

22          MR. ROMANO:  Your Honor, I don't have anything to

23    add via oral argument beyond our pleadings.  But the

24    Government believes in general both the Court can order

25    restitution here and that restitution is appropriate.  The

1   nature of the riot is collective action; and the damage that

2   was caused to the Capitol was enabled by the number of

3   people who descended on the Capitol and attacked police

4   officers.  But given that the whole mob enabled the amount

5   of damage that's been caused, the Government thinks it's

6   appropriate to order restitution here for similar reasons

7   that we've been seeking it in plea agreements.  We

8   understand this is not a plea context, but we think it's

9   appropriate to order it.

10          THE COURT:  Thank you.

11          Mr. Sargent, you've heard the discussions.  I've

12  made a decision on the guidelines that apply.  It's your

13  opportunity to come and talk to the Court about your

14  situation, how you view it and what you want the Court to

15  consider.

16          You're obviously an intelligent man that's

17  accomplished in various fields of work that you've done.

18  And you understand your situation.  So I'd like to hear from

19  you.

20          THE DEFENDANT:  Thank you, your Honor.

21          I would like to apologize for the role I played on

22  January 6th.  A day that should have been a day to remember

23  quickly turned into a nightmare I wish I could forget.

24          I am truly ashamed and disappointed in myself and

25  my actions.

1          I let many people down on that day; not only

2    myself, my family and my friends, but also and most

3    importantly my country.

4          I had no idea the events of that day would

5    transpire and didn't realize its severity until the next

6    morning when I turned on the TV.  When I saw the magnitude

7    of the day prior, my heart sank.

8          Alcohol was a big contributor factor in my

9    behavior on January 6th.  And for my posts online the

10   following day, there is no excuse.

11         I was done embarrassing myself and decided

12   quitting drinking was the right thing to do.

13         I'm not proud of my actions; and if I knew that

14   some people had plans of causing a disturbance, I never

15   would have attended.

16         I also want to give my heartfelt apologies for the

17   harm that I caused the officers, Congress and their families

18   and for the fear that they all experienced.

19         Officers and Congress members were afraid for

20   their lives and their family members worried that their

21   loved ones would not return safe, but I know I contributed

22   to it.  This was never my intention.  The events of that day

23   were unwarranted and undeserved.

24         This experience has affected me in many ways.  The

25   regret and stress my actions caused me and my family,

1    combined with the resulting legal troubles, led me down a

2    path I thought I left in my past.

3            I am grateful for the patience, understanding and

4    effort that has been invested in me and my recovery by the

5    judge, the courts and Probation.  For that I would like to

6    say thank you.

7            I have also learned to be more tolerant and

8    accepting of others, their views and their actions.  Through

9    this process, I have realized how I took my freedom and my

10   family for granted.  For that, they have been suffering

11   every day, especially my 18-month hold son, Elon.

12           I am determined and dedicated to maintain my

13   sobriety and will never let them down like this again.

14           Upon my release, I plan to continue working at my

15   trades of carpentry and masonry for my friend's company,

16   Slip Services, where I have a job waiting for me.  I plan on

17   being the best father and role model to my two sons and

18   overall best person I can be.  I plan on making up for this

19   mess and heartache I have caused my girlfriend, my youngest

20   son, Elon, my oldest son, T.J., and my mother and in every

21   way possible.

22           I also plan on investing in my community and

23   becoming more involved by volunteering my time and effort

24   wherever and however possible.

25           Thank you.

1          THE COURT:  Thank you, Mr. Sargent.

2          I've read the letters, as I said, of your family

3    members.  Your mother pointed out that you had gotten

4    extreme.  You had followed various programs on YouTube or

5    other social media, internet programs that allowed you to

6    view a lot of misinformation and you became a believer of

7    very extreme views.  In fact, she said they'd hesitate to

8    invite you to some family meetings because you were so

9    wrapped up in what you believed in and very argumentative

10   about it.  And I think you've gotten through that.

11   Hopefully, you will follow better sources from now on.

12          I do find that you came down to the rally, which

13   is appropriate to do -- there's nothing wrong with that --

14   with your wife and a friend.  But then you walked to the

15   Hill, up to Capitol Hill, and got involved in the riot.

16   Your wife indicated in her letters that she was pregnant at

17   that time and she began to smell the smoke and the gas and

18   got scared.  You all got separated and you lost her and she

19   eventually got back to the hotel safe.  But you continued

20   on, despite the fact that she was gone.

21          And there are many things you said and published

22   about your activities and your beliefs that day.  And you

23   obviously purposely came down from the media tower and

24   joined in the fight when you saw it going on.  That's what

25   you wanted to do.  And as I found, I think that all

1          contributed to the civil unrest that you participated in as

2          well as the assaults on the Capitol Police officers that you

3          bragged about several times, including afterwards.  Even

4          though you said you were shocked after you saw the TV the

5          next morning, later on, you still bragged about it to your

6          friends.

7                    And then when the FBI came several months later,

8          you were still having an attitude besides being regretful

9          that you got caught, I think, or that you were there that

10         you said regarding the alleged assault it was like slapping

11         a mosquito.

12                    So it's taken a while for you to adjust where

13         you're coming from and what you're doing.

14                    I was disappointed that we couldn't keep you under

15         treatment.  Your pretrial release, I had extended it several

16         times for you to get various outpatient and inpatient

17         treatment.  And that's something you have to get over

18         eventually no matter how -- it's a hard, hard thing to do.

19         Just like being an alcoholic, you'll be a drug addict all

20         your life, even though you're no longer taking the drugs.

21         But the danger is always there and you're going to have to

22         live with that if you want to have your son grow up and see

23         him grow up and succeed as well as watch the adventures of

24         your older son.  But it's something you've got to think

25         about.

1          Under the 18 3553(a) factors and the factors the

2     Government has reviewed, I will review them briefly to make

3     sure the 3553(a) factors -- to make sure to follow the

4     sentences in line with those requirements.  We've talked

5     about the nature and circumstances of the offense.  I'm not

6     going to go into a long explanation of what happened that

7     day.  I think it's pretty well recognized.

8          One of the saddest things out of that day is not

9     only the interruption of Congress and all these people that

10    rioted against their own Capitol and against the police, but

11    that there are political figures thereafter that have

12    continued to deny it ever occurred, to deny anything wrong

13    happened, to try to justify what happened.  And I think that

14    continuing exercise of some political figures is shameful

15    and is hurtful to our republic.

16         But I have to look at your individual conduct and

17    assess it in a spectrum of others that people have talked

18    about what each one individually did.  It's an individual

19    sentence.  And you did not enter the Capitol.  That saved

20    you an awful lot of time in jail by that decision to go only

21    after the fight.

22         Engage in violence:  You did.  You didn't destroy

23    any property or help others destroy property.

24         You reacted -- after these acts of violence and

25    all, you left.  And you did not destroy evidence.  There's

1     no evidence of that.

2          You were there some time on the Capitol grounds

3     illegally, but not an excessive amount of time.

4          You made some statements in person and to the

5     media that were bothersome, as I said, and continued up

6     until the time the FBI arrested you.  But I think now you're

7     over that.

8          Your interaction with law enforcement, you had

9     that one interaction.  I think that was the end of it.  And

10    you have exhibited, I think, a true remorse and contrition

11    at this time.

12         It sort of puts you on a spectrum where you should

13    come up on this.  I am bothered by obviously that you

14    constantly made a decision after seeing the riot going on

15    from the media tower, you came down to join it and said

16    that's what you wanted to do.

17         Then you attacked the police officer.  You thought

18    you struck him twice.  At least you said that.  And then you

19    said you got Maced and you said you jumped out from behind

20    somebody and punched them as hard as you could right in his

21    visor.  You told someone else you punched a cop three times.

22    There's no question that was in your mind, what you had

23    wanted to do and you had done and that that was something

24    you were celebrating, unfortunately.  It was not that you

25    were at that point sorry for what you had done.

1          Your history and characteristics:  You had a

2    tough -- when you were a youngster, a younger man, you had

3    some tough times with the law, but it did not count against

4    you in the guidelines, despite the various offenses and

5    arrests.  That's not added to your offense here.

6          Respect for the law and the sentence imposed

7    reflects the seriousness of the offense:  We have given

8    sentences, this Court has, or many other judges, that have

9    varied from probation to multiple years in prison based upon

10   the conduct, which was individual, all recognizing, however,

11   no matter how slight the offense is, there couldn't be a

12   riot without people.  Everyone added to the mass of the riot

13   when they joined it.  I hear some of these cases, "I just

14   walked down there."  Well, you joined the riot.  You're

15   supporting it by your presence.

16          The need to afford adequate deterrence:  In other

17   words, you won't do it again, generally to deter the public

18   and others when they see what happens here as well as

19   yourself, to protect the public from further crimes by you.

20   And then there's specific deterrence and whether that weighs

21   here for a substantial sentence.

22          You did have some assaultive behavior as a younger

23   person, but it's not been counted against you in

24   consideration of this.  You have expressed remorse and

25   contrition.  Your statements afterwards, as I said, your

1    media statements indicated not that, but the opposite, for

2    some time.  And you came -- you're facing jail, but I think

3    you've realized what you've done here by bragging about this

4    to others and encouraging them.

5         The guidelines really are set up to help the Court

6    with rational sentences.  And we have to consider that in

7    light of the individual sentenced before us and what you

8    have done and try to avoid sentencing disparities.

9         I've been concerned about it in these cases.  It

10   is very hard.  And both sides cited to us many cases out of

11   the 800 plus, 890, whatever number of cases, of differing

12   sentences.  I try to minimize any disparities that I can.

13   But some judges have different views about different kinds

14   of conduct.  I try to balance it looking at the aggravating

15   and mitigating circumstances in these matters.

16        I don't think the *Creek* case is an exact example

17   to what you did.  It was 27 months.  I think you joined the

18   riot for whatever reasons you had that would result in the

19   suspending of the congressional actions for several hours

20   before they could resume their -- once they got everybody

21   out of the Capitol, resume their deliberations and whatever

22   their constitutional duties were to continue with the

23   Electoral College vote.

24        And you're in a situation with your family

25   situation, your background and history and the concerns

1      about what you did.  I don't think -- except for my concerns

2      on your drug addiction, frankly, I don't think you're a

3      candidate for some type of recidivism and will go back and

4      join another riot when we have the general election for

5      president in 2024 if you weren't happy with the result.

6      It's evident to me that you're out of that type of conduct.

7      I don't have that problem.

8              I do have a problem that you joined in the riot;

9      you attempted to attack a police officer; you succeeded in

10     slapping him once; and that you tried a second time and that

11     you bragged about it despite your horror, you said, the next

12     day of seeing on TV this horrible riot, maybe 140 police

13     officers seriously injured.

14             What really affects me is you did apologize, which

15     I appreciate, to the police and the staff of the Congress

16     members that were there.  And they were terrified and beaten

17     badly.  The police were beaten badly.  There were four

18     policemen, I believe, within a few weeks of that that died

19     or committed suicide after the riot.  And what they had gone

20     through they couldn't live with.  There have been many more

21     than that that have now retired.  They couldn't face any

22     more psychologically.  It has a tremendous effect on people

23     and their families.

24             But it's really not been considered, I think, by

25     enough people what's really happened there besides the

1      attack to our democracy, which will go down in history as

2      one of the worst things that ever happened in our country.

3             But I have to consider your own situation.  And I

4      think that you now at least are making attempts to lead a

5      better life and take care of your youngster and your

6      responsibilities with the family.

7             I'm going to give you the following sentence.  And

8      I'm going to depart downward.  I'm going to vary from the

9      range that was provided for by the sentencing guidelines as

10     24 to 30 months.  I'm not going to sentence you to that

11     length of sentence.  I'm not going to give you the sentence

12     your counsel asked for.  I see no basis to go down that far

13     at all.

14            But because I think of your situation, not only

15     your family support that you have, your drug addiction,

16     which is a serious problem you have to somehow overcome so

17     you can lead a different life and live long enough to see

18     your child grow up, I mean, you've got all the motivation in

19     the world with your new child.  But you're going to have to

20     go through a lifetime denying yourself any types of drugs.

21     Otherwise, you'll return back to where you are, where

22     someone will have to jail you.

23            And I think it's appropriate under the

24     guidelines -- I think there's grounds for a variance for

25     your situation.  As I said, your drug addiction, your

1     family's dependence upon you and I think the recognition of

2     what you've done:  I think it's all appropriate for a

3     variance.

4              So I'm not going to sentence you to the 24 months.

5     I'm going to sentence you as follows in this case:

6              Pursuant to the Sentencing Reform Act of 1984, and

7     in consideration of the provisions of 18 USC 3553(a) and of

8     the advisory sentencing guidelines that I determined would

9     apply in your case, it is the judgment of the Court that

10    Troy Sargent is committed to the custody of the Bureau of

11    Prisons for a term of 14 months.  That's the high range of

12    the lower range that your counsel felt would apply.  That'll

13    be concurrent terms of 14 months as to Count 1 and Count 2;

14    12 months as to Counts 3 through 5; and six months as to

15    Count 6.

16             You are further sentenced to serve a term of 24

17    months -- that's two years -- of supervised release.  That's

18    24 months, two years, as to Counts 1 and 2 and 12 months as

19    to Counts 3 through 5, served concurrently.

20             In addition, we'll impose a special assessment of

21    $285, that is, $100 for each felony conviction, $25 for each

22    misdemeanor conviction, under Title 18, 3663.  That's $285.

23             Now, you get two months' approximately -- it's up

24    to the prison -- credit for the two months you've served in

25    prison so far.

1            You're going to be on supervised release.  That is

2     going to keep you under the control of the Court for two

3     years.  If you don't meet the terms of supervised release,

4     there is mandatory an additional term I'm going to assess.

5     I can put you back in jail.

6            While you're on supervision, you shall abide by

7     the following mandatory conditions as well as all the other

8     conditions recommended by the probation office in Part D of

9     the sentencing guidelines options of the presentence report

10    which are imposed to establish the basic expectations for

11    your conduct while on supervision.

12           The mandatory ones in every case are:  You can't

13    commit any other crimes, federal, state or local.  That

14    would be a violation subject to your going back to jail.

15    You must not unlawfully possess a controlled substance.

16    That's your problem.  You're going to have to face that.

17    And that'll be for the next two years after you're released.

18    You must refrain from unlawful use of a controlled

19    substance.

20           You'll submit to one drug test within 15 days of

21    placement on supervision and two periodic drug tests

22    thereafter as determined by the Court to the probation

23    office.

24           You'll cooperate in the collection of DNA evidence

25    as directed by the probation office.

1              Now, as to restitution, the Government has the

2       power to request restitution in this matter.  They have

3       cited the statutes that apply to this.  And I think they're

4       correct in their consideration of this.

5              However, the Government's asked for $2,000 worth

6       of restitution.  I am not going to apply that to you for two

7       reasons.  I have to find facts that would justify the

8       restitution.  It's something that you did to justify

9       restitution.

10             Now, there's over $2.8 million of damage that's

11      been done to the Capitol.  That's the latest figure.  There

12      have been many people convicted of felonies who by consensus

13      of the Court and the Defendants and the prosecutors end up

14      paying $2,000 in restitution.

15             We have no agreement as to that here.  My finding

16      is that you participated in the riot with the attempt to

17      assault the police officer and you were intending to do that

18      to cause further damages and riot and delay or obstruct in

19      the -- by your civil actions to Count 1, the civil unrest

20      that you contributed to, resulting in the delaying of the

21      Electoral College vote.

22             And so you should be responsible for some type of

23      restitution.  You saw the damage being done.  You were on

24      the tower.  You saw the people going through the barricades,

25      the police being attacked, the tear gas being expended,

1    officers fleeing.  You were all part of that in the midst of

2    that.  In fact, you forced your way to the front of the line

3    to join in that.

4            So I think it's appropriate that you be assessed

5    restitution under the law.  It is the determination of the

6    Court that there are sufficient facts to allow that and

7    overcome your opposition by your counsel that the statutes,

8    I think, do apply as to restitution, and that I'm going to

9    assess restitution considering your financial situation,

10   which is very poor, that you'll pay restitution of $500; and

11   that that will be made in accordance with Title 18, USC 3663

12   and 3663A and the other statutes authorizing the sentence of

13   restitution.

14           That $500 payment will be worked out through your

15   probation office when you're released as to how you can make

16   those payments over a period of time.  That'll be paid to

17   the Architect of the Capitol.

18           The payments will be made for disbursement to the

19   Architect of Capitol and paid to the clerk for this court.

20           Now, the restitution has to be paid, generally,

21   say, $100 a month.  I'm putting down $50 a month once you're

22   released from prison and are employed, because I don't think

23   you can afford it now.

24           Now, to get the restitution paid, you'll have to

25   provide the probation office access to requested financial

1    information and release that to them.

2           You also have to be working with Probation to not

3    incur any new credit cards or additional lines of credit.

4           As to your substance abuse problem, you must

5    participate in either an inpatient or outpatient substance

6    abuse treatment program and follow the rules of that

7    program.  That'll be supervised by the probation office, the

8    participation in this programs.  They'll provide those

9    details for you, which I hope can be done in your vicinity

10   where you live.

11          Substance abuse testing:  Because of your

12   problems, you'll have to submit to substance abuse testing

13   to determine if you've used prohibited substances.  You have

14   to agree to have that done and not attempt to obstruct it in

15   any way.

16          Mental health treatment:  I think when you get

17   out, you should participate in some mental health treatment

18   program; and that will be in consultation with the probation

19   office and a treatment provider who will supervise the

20   program for you.  And I don't think that -- I don't know how

21   long that will last, but I think it would help, particularly

22   in getting back into society after probably a year of

23   incarceration.

24          Within 60 days of your release from incarceration

25   or placement on supervision, you'll appear before the Court

1     for a reentry progress hearing.  Prior to the hearing, the

2     probation office will submit a report summarized by your

3     status in compliance with your release conditions.  If

4     you're being supervised back in Massachusetts, which I'll

5     allow you to be, Probation in that district will submit a

6     progress report to the Court within 60 days of commencement

7     of supervision.  And then, depending upon that report, the

8     Court will determine if your presence is required.

9               I'm not going to impose any fines.  I don't think

10    you have any ability in your financial situation to pay any

11    fines.

12              Now, there is, however, the cost of the

13    prosecution that's been awarded under the statute, which was

14    the monies that I indicated earlier, the $285 for the

15    convictions.  You'll have to arrange to pay that to the

16    Clerk of the Court for the District of Columbia here.

17              Now, the probation office can release the

18    presentence report to appropriate agencies, including other

19    probation offices where you live, to carry out the sentence

20    of the Court.  Any treatment agencies shall return the

21    report when they're finished with it.

22              Now, this is a straight plea to all the charges

23    without any plea agreement.  Therefore, you have a right to

24    appeal the sentence imposed by the Court under 18 USC 3742.

25    If you choose to appeal, you have to do so within 14 days

1      after entry of the judgment, which will probably be today or

2      tomorrow.  If you can't afford the cost of an appeal, you

3      can request permission from the Court to file an appeal

4      without cost and also request a lawyer to be appointed for

5      you if you can't afford one.

6              Additionally, you have the right under 28 USC 2255

7      to challenge this conviction entered or sentence imposed if

8      new and currently unavailable information becomes available

9      to you or if you have a claim you received ineffective

10     assistance of counsel; in other words, Mr. Hanye didn't do a

11     good job for you, in entering your pleas of guilty to the

12     offenses or in connection with the sentencing.  Again, if

13     you can't afford the cost of an appeal, you can have that

14     waived.

15             All right.  Let me ask Ms. Field, is there

16     anything else with the sentence we need to do here?

17             THE PROBATION OFFICER:  No, your Honor.  Thank

18     you.

19             THE COURT:  That's sufficient?

20             MR. ROMANO:  Just one small matter.

21             THE COURT:  Let me ask what counsel have.

22             MR. ROMANO:  I believe the plea was to the -- I

23     believe the Defendant pleaded guilty to charges in a

24     superseding indictment.

25             THE COURT:  He did.

1          MR. ROMANO:  And so the original indictment

2     remains outstanding.  We move to dismiss all of those

3     charges.

4          THE COURT:  The original indictment, yes, would be

5     dismissed.  There was a superseding indictment.

6          That'll be the sentence of the Court, then.

7          I will make the strong recommendation as to the

8     prison sentence that Mr. Sargent would be put in Devens

9     Prison FMC in Massachusetts to be near his family.

10         MR. HANYE:  Thank you, your Honor.

11         THE COURTROOM DEPUTY:  Your Honor, may I ask a

12    clarifying question, please?

13         As to Counts 3 through 6, there are sentences that

14    you imposed for those.  Are they running concurrent to

15    counts --

16         THE COURT:  All concurrent with each other.

17         THE COURTROOM DEPUTY:  Thank you.

18         THE COURT:  Everything is concurrent with each

19    other.  Make sure we have that right.

20         That'll be the sentence of the Court.

21         (Proceedings concluded.)

22

23

24

25

**<u>CERTIFICATE</u>**

1

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10              Dated this 9th day of January, 2023.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**$**

**$100** [2] - 59:21, 62:21
**$2,000** [3] - 38:11, 61:5, 61:14
**$25** [1] - 59:21
**$285** [3] - 59:21, 59:22, 64:14
**$50** [1] - 62:21
**$500** [2] - 62:10, 62:14

**/**

**/s** [1] - 67:12

**0**

**02130** [1] - 1:19

**1**

**1** [8] - 10:16, 15:4, 25:22, 29:6, 30:19, 59:13, 59:18, 61:19
**100-year-old** [1] - 34:24
**111** [12] - 8:7, 8:21, 19:9, 19:10, 19:11, 19:16, 19:22, 21:18, 23:8, 25:13, 27:18, 27:22
**111(a** [4] - 6:2, 8:13, 10:23, 28:21
**1196** [1] - 27:2
**11:09** [1] - 1:7
**11th** [1] - 18:15
**12** [3] - 1:6, 59:14, 59:18
**1331** [1] - 1:15
**14** [4] - 17:25, 59:11, 59:13, 64:25
**140** [1] - 57:12
**15** [1] - 60:20
**1512** [2] - 42:25, 43:8
**1512(c)(2** [1] - 47:2
**17** [3] - 4:23, 14:9, 30:17
**18** [14] - 4:20, 8:7, 8:21, 19:16, 33:21, 39:20, 42:25, 47:1, 47:2, 53:1, 59:7, 59:22, 62:11, 64:24
**18-month** [1] - 50:11
**18-month-old** [1] - 34:25

**18-year-old** [1] - 32:25
**1984** [1] - 59:6

**2**

**2** [7] - 10:16, 15:3, 28:18, 29:7, 30:20, 59:13, 59:18
**2,000** [2] - 38:20, 38:23
**2.8** [1] - 61:10
**20** [1] - 8:23
**20001** [2] - 1:25, 67:14
**20004** [1] - 1:15
**2019** [1] - 18:16
**202** [2] - 1:25, 67:15
**2021** [2] - 32:23, 40:6
**2022** [2] - 1:6, 27:3
**2023** [1] - 67:10
**2024** [1] - 57:5
**21-00258** [1] - 1:3
**21-258** [1] - 2:3
**22** [1] - 43:7
**2255** [1] - 65:6
**231** [2] - 21:21, 24:2
**231(a)(3** [1] - 47:1
**24** [8] - 5:3, 18:1, 30:19, 37:21, 58:10, 59:4, 59:16, 59:18
**24-month** [1] - 5:4
**27** [2] - 39:24, 56:17
**28** [2] - 6:23, 65:6
**2A2.2** [15] - 8:6, 18:5, 19:9, 19:11, 19:17, 20:1, 20:2, 20:24, 21:3, 21:8, 21:23, 25:4, 27:7, 29:15, 42:12
**2A2.4** [9] - 8:6, 18:5, 19:9, 19:11, 19:17, 20:2, 20:24, 25:17, 29:15
**2J** [1] - 43:2

**3**

**3** [3] - 59:14, 59:19, 66:13
**30** [4] - 5:3, 30:19, 37:22, 58:10
**333** [2] - 1:24, 67:14
**354-3269** [2] - 1:25, 67:15
**3553(a** [8] - 4:20, 31:7, 31:11, 32:19, 39:21, 53:1, 53:3,

59:7
**3663** [2] - 59:22, 62:11
**3663A** [1] - 62:12
**3742** [1] - 64:24
**3:00** [1] - 37:19

**4**

**41** [1] - 43:8
**459** [1] - 14:10

**5**

**5** [2] - 59:14, 59:19
**50** [1] - 27:2
**51** [2] - 1:18, 43:8

**6**

**6** [2] - 59:15, 66:13
**60** [2] - 63:24, 64:6
**6706** [1] - 1:24
**6th** [11] - 22:10, 32:23, 33:16, 40:6, 42:15, 43:16, 43:24, 45:1, 45:4, 48:22, 49:9

**8**

**800** [1] - 56:11
**890** [1] - 56:11

**9**

**944** [1] - 6:24
**9th** [1] - 67:10

**A**

**a.m** [1] - 1:7
**abide** [1] - 60:6
**ability** [2] - 64:10, 67:7
**able** [3] - 22:15, 22:17, 24:15
**abuse** [4] - 63:4, 63:6, 63:11, 63:12
**acceptance** [1] - 36:12
**accepting** [3] - 34:4, 50:8
**access** [1] - 62:25
**accompanied** [1] - 18:17

**accomplish** [1] - 39:10
**accomplished** [1] - 48:17
**accomplishes** [1] - 37:3
**accordance** [1] - 62:11
**account** [4] - 32:16, 34:8, 34:9, 42:11
**accurate** [1] - 67:4
**acknowledged** [1] - 31:15
**Act** [1] - 59:6
**act** [1] - 17:11
**acted** [2] - 23:8, 24:9
**acting** [1] - 24:3
**Action** [1] - 1:3
**action** [4] - 24:14, 28:2, 42:23, 48:1
**actions** [10] - 33:20, 41:13, 41:15, 48:25, 49:13, 49:25, 50:8, 56:19, 61:19
**activities** [1] - 51:22
**acts** [2] - 24:19, 53:24
**actual** [2] - 11:16, 13:22
**add** [1] - 47:23
**added** [2] - 55:5, 55:12
**addict** [1] - 52:19
**addiction** [4] - 35:8, 57:2, 58:15, 58:25
**addition** [1] - 59:20
**additional** [4] - 25:15, 43:10, 60:4, 63:3
**additionally** [3] - 4:8, 5:7, 65:6
**address** [2] - 4:21, 44:15
**addressed** [6] - 13:15, 13:24, 17:2, 25:20, 38:11, 47:13
**addresses** [1] - 12:21
**addressing** [2] - 14:1, 18:4
**adequate** [1] - 55:16
**adjust** [1] - 52:12
**administrative** [1] - 7:9
**admirable** [1] - 44:13
**admits** [1] - 37:24
**advances** [1] - 39:24
**adventures** [1] - 52:23
**advisory** [3] - 30:21,

30:25, 59:8
**affected** [1] - 49:24
**affects** [1] - 57:14
**afford** [5] - 55:16, 62:23, 65:2, 65:5, 65:13
**afraid** [1] - 49:19
**afterwards** [2] - 52:3, 55:25
**agencies** [3] - 12:21, 64:18, 64:20
**agency** [2] - 7:18, 13:16
**agency's** [2] - 7:9, 13:10
**aggravate** [1] - 31:6
**aggravated** [25] - 5:16, 6:3, 6:5, 6:6, 9:4, 9:19, 9:21, 9:25, 10:11, 16:3, 18:9, 18:17, 18:23, 19:2, 20:2, 25:4, 25:16, 27:6, 27:12, 27:22, 28:6, 28:9, 28:24, 29:16, 30:14
**aggravating** [1] - 56:14
**ago** [2] - 3:11, 40:13
**agree** [4] - 16:9, 25:18, 26:13, 63:14
**agreed** [2] - 15:16
**agreement** [11] - 15:20, 15:21, 21:7, 28:17, 29:1, 29:2, 29:6, 29:8, 29:10, 61:15, 64:23
**agreements** [1] - 48:7
**agrees** [2] - 19:25, 20:1
**ahead** [1] - 18:3
**aid** [1] - 3:15
**alcohol** [1] - 49:8
**alcoholic** [1] - 52:19
**alignment** [1] - 15:11
**alleged** [1] - 52:10
**allow** [3] - 24:18, 62:6, 64:5
**allowed** [1] - 51:5
**allows** [1] - 35:17
**almost** [1] - 45:10
**alternate** [1] - 18:12
**ambiguity** [3] - 7:25, 8:2, 19:5
**ambiguous** [7] - 7:23, 8:11, 9:24, 11:20, 18:10, 18:24, 26:12
**America** [1] - 2:3
**AMERICA** [1] - 1:3

**American** [1] - 40:8
**amount** [3] - 4:25, 48:4, 54:3
**Amy** [1] - 4:11
**analogous** [1] - 13:24
**answer** [1] - 23:22
**anxiety** [1] - 35:23
**anyway** [1] - 30:6
**apologies** [1] - 49:16
**apologize** [2] - 48:21, 57:14
**appeal** [5] - 64:24, 64:25, 65:2, 65:3, 65:13
**appear** [2] - 40:19, 63:25
**appearance** [1] - 2:7
**aPPEARANCES** [1] - 1:13
**appendix** [1] - 19:14
**application** [5] - 14:5, 15:22, 18:5, 21:8, 28:6
**applied** [9] - 14:10, 14:18, 21:15, 21:19, 25:9, 26:20, 37:23, 43:1, 46:4
**applies** [6] - 6:5, 8:24, 13:11, 20:24, 31:3, 42:13
**apply** [28] - 4:18, 6:7, 7:4, 10:11, 11:7, 13:25, 14:16, 14:22, 16:11, 17:22, 19:19, 20:22, 21:3, 21:11, 22:1, 23:16, 23:17, 24:23, 25:5, 27:23, 27:24, 28:24, 48:12, 59:9, 59:12, 61:3, 61:6, 62:8
**applying** [2] - 8:7, 32:15
**appointed** [1] - 65:4
**appreciate** [3] - 3:20, 39:13, 57:15
**approach** [4] - 5:17, 15:2, 29:14, 44:23
**approached** [1] - 26:1
**appropriate** [23] - 17:22, 19:6, 21:3, 23:15, 23:17, 24:23, 25:12, 27:7, 27:8, 27:21, 28:23, 30:23, 31:18, 45:10, 47:25, 48:6, 48:9, 51:13, 58:23, 59:2, 62:4, 64:18
**approving** [1] - 30:9

**Architect** [2] - 62:17, 62:19
**areas** [1] - 25:21
**argue** [5] - 24:8, 31:6, 33:14, 44:7, 45:25
**argued** [3] - 10:2, 21:13, 26:7
**argues** [1] - 39:21
**arguing** [1] - 46:5
**argument** [26] - 9:18, 10:9, 10:14, 10:22, 11:11, 11:24, 14:21, 14:23, 17:24, 18:5, 18:8, 19:8, 19:21, 23:23, 25:10, 25:19, 25:23, 28:12, 29:2, 29:12, 31:9, 38:15, 38:22, 47:21, 47:23
**argumentative** [1] - 51:9
**arrange** [1] - 64:15
**arrest** [1] - 34:6
**arrested** [1] - 54:6
**arrests** [1] - 55:5
**arrogant** [1] - 33:15
**articulated** [1] - 23:10
**ashamed** [1] - 48:24
**assault** [57] - 5:16, 6:2, 6:3, 6:5, 6:6, 6:8, 8:7, 8:14, 8:25, 9:3, 9:4, 9:19, 9:21, 9:25, 10:12, 16:3, 16:6, 16:7, 16:16, 16:17, 16:21, 16:24, 17:2, 18:10, 18:17, 18:24, 19:2, 20:3, 21:5, 21:23, 22:25, 23:1, 23:6, 24:4, 24:9, 25:4, 25:5, 25:16, 27:7, 27:13, 27:22, 28:6, 28:9, 28:25, 29:16, 30:13, 30:14, 31:6, 37:25, 42:5, 45:23, 52:10, 61:17
**assault-on-officer** [1] - 21:5
**assaulted** [2] - 29:25, 40:17
**assaulting** [1] - 23:8
**assaultive** [3] - 47:4, 47:5, 55:22
**assaults** [8] - 19:23, 19:24, 20:11, 20:12, 46:24, 52:2
**assertion** [1] - 21:12
**assess** [6] - 25:14, 44:20, 44:24, 53:17, 60:4, 62:9

**assessed** [2] - 5:16, 62:4
**assessing** [1] - 24:2
**assessment** [1] - 59:20
**assistance** [1] - 65:10
**assuming** [1] - 43:1
**attachments** [1] - 3:19
**attack** [5] - 25:11, 25:24, 40:8, 57:9, 58:1
**attacked** [4] - 41:6, 48:3, 54:17, 61:25
**attacking** [2] - 30:4, 30:5
**attacks** [2] - 41:10, 41:16
**attempt** [4] - 17:3, 30:14, 61:16, 63:14
**attempted** [2] - 30:13, 57:9
**attempts** [1] - 58:4
**attend** [1] - 35:13
**attended** [1] - 49:15
**attending** [2] - 4:7, 17:20
**attention** [1] - 3:25
**attitude** [1] - 52:8
**audience** [1] - 3:5
**authoritative** [3] - 12:9, 12:14, 26:16
**authority** [8] - 6:19, 6:22, 6:25, 7:19, 11:12, 12:6, 27:5
**authorizing** [1] - 62:12
**authors** [1] - 20:10
**available** [1] - 65:8
**Avenue** [2] - 1:24, 67:14
**avoid** [1] - 56:8
**avoids** [1] - 40:2
**awarded** [1] - 64:13
**awareness** [1] - 17:11
**awful** [1] - 53:20

**B**

**b)** [1] - 9:22
**background** [2] - 4:5, 56:25
**bad** [1] - 36:16
**badly** [2] - 57:17
**balance** [1] - 56:14
**bank** [2] - 16:24, 16:25

**Banks** [3] - 7:5, 11:13, 13:2
**barricades** [1] - 61:24
**based** [7] - 12:4, 23:14, 25:12, 31:8, 32:18, 39:18, 55:9
**basic** [1] - 60:10
**basis** [1] - 58:12
**bears** [1] - 40:6
**beaten** [2] - 57:16, 57:17
**became** [1] - 51:6
**become** [2] - 37:1, 38:23
**becomes** [2] - 6:4, 65:8
**becoming** [1] - 50:23
**BEFORE** [1] - 1:10
**began** [1] - 51:17
**beginning** [2] - 2:7, 47:17
**behalf** [2] - 2:5, 3:20
**behavior** [3] - 34:9, 49:9, 55:22
**behind** [2] - 35:25, 54:19
**beliefs** [2] - 44:1, 51:22
**believer** [1] - 51:6
**believes** [1] - 47:24
**below** [2] - 6:18, 43:13
**benefits** [1] - 45:14
**Berman** [8] - 4:11, 6:14, 10:10, 14:24, 15:9, 21:1, 21:17, 24:11
**Berman's** [1] - 16:1
**best** [7] - 39:24, 44:18, 44:22, 47:18, 50:17, 50:18, 67:7
**better** [6] - 35:10, 36:1, 37:18, 44:23, 51:11, 58:5
**between** [5] - 6:15, 15:9, 30:3, 31:4, 44:21
**beyond** [3] - 25:23, 42:23, 47:23
**big** [1] - 49:8
**binding** [3] - 27:1, 27:5, 30:21
**black** [2] - 11:17, 11:23
**Black's** [3] - 18:14, 18:15, 18:16
**Blockburger** [1] - 23:13
**boastful** [1] - 33:15

**bodily** [7] - 8:24, 9:12, 9:14, 10:5, 18:20, 27:14, 32:13
**bond** [1] - 5:10
**BOP** [1] - 37:11
**Boston** [1] - 1:19
**bothered** [1] - 54:13
**bothersome** [1] - 54:5
**bound** [1] - 27:22
**boy** [1] - 4:3
**bragged** [3] - 52:3, 52:5, 57:11
**bragging** [1] - 56:3
**brain** [2] - 45:12, 45:18
**break** [2] - 23:3, 41:19
**briefed** [1] - 21:13
**briefly** [3] - 4:15, 17:18, 53:2
**bring** [1] - 31:21
**broken** [2] - 41:7, 41:20
**brother** [2] - 4:4, 32:25
**brought** [4] - 31:23, 32:12, 37:17, 41:24
**brutal** [1] - 41:10
**building** [3] - 42:1, 42:9, 42:22
**Bureau** [2] - 39:2, 59:10
**BY** [1] - 1:22

**C**

**calculation** [1] - 23:18
**calculations** [2] - 5:1, 21:11
**calmer** [1] - 33:2
**candidate** [1] - 57:3
**cannot** [1] - 11:24
**Capitol** [17] - 22:10, 38:5, 40:11, 40:12, 40:15, 42:4, 48:2, 48:3, 51:15, 52:2, 53:10, 53:19, 54:2, 56:21, 61:11, 62:17, 62:19
**car** [1] - 34:17
**cards** [1] - 63:3
**care** [2] - 45:18, 58:5
**carefully** [1] - 3:17
**caretaker** [1] - 35:1
**carpentry** [1] - 50:15
**carry** [2] - 33:19, 64:19

**carve** [1] - 13:12
**case** [52] - 4:10,
5:18, 6:7, 7:5, 7:16,
7:22, 7:23, 11:1,
11:13, 12:2, 12:20,
12:23, 12:24, 13:4,
13:9, 13:21, 14:2,
14:9, 15:20, 16:1,
21:2, 21:17, 21:20,
23:24, 24:9, 25:21,
26:3, 26:4, 26:18,
26:19, 26:20, 27:3,
28:8, 28:17, 28:19,
28:22, 29:7, 30:17,
31:7, 39:14, 43:7,
44:9, 45:6, 45:10,
45:22, 45:23, 46:11,
56:16, 59:5, 59:9,
60:12
**cases** [24] - 8:24,
9:12, 13:24, 14:14,
15:9, 16:12, 16:15,
25:25, 31:5, 37:23,
42:15, 43:17, 44:25,
45:1, 45:2, 46:12,
46:18, 46:23, 46:24,
47:11, 55:13, 56:9,
56:10, 56:11
**Category** [2] - 4:23,
30:18
**caught** [1] - 52:9
**caused** [7] - 32:13,
35:23, 48:2, 48:5,
49:17, 49:25, 50:19
**causing** [2] - 10:5,
49:14
**cautious** [1] - 2:12
**celebrating** [1] -
54:24
**cell** [1] - 42:2
**center** [1] - 22:13
**central** [1] - 47:16
**certainly** [15] - 10:22,
12:22, 14:17, 18:24,
21:24, 22:24, 23:8,
24:8, 31:18, 33:10,
36:14, 44:5, 44:10,
45:8, 45:19
**CERTIFICATE** [1] -
67:1
**certify** [1] - 67:4
**cetera** [1] - 27:15
**challenge** [1] - 65:7
**challenging** [1] -
25:19
**chance** [1] - 3:11
**change** [2] - 33:1,
33:20
**changes** [3] - 32:22,
33:6, 34:10

**characteristics** [2] -
20:14, 55:1
**charge** [5] - 21:18,
23:17, 24:7, 28:21,
42:25
**charged** [3] - 43:7,
47:1, 47:2
**charges** [5] - 23:12,
23:16, 64:22, 65:23,
66:3
**child** [3] - 4:9, 58:18,
58:19
**choices** [5] - 31:13,
31:17, 32:20, 36:16
**choose** [1] - 64:25
**chose** [3] - 31:13,
38:18, 41:20
**circles** [1] - 16:8
**Circuit** [14] - 11:13,
11:18, 11:23, 12:17,
12:18, 13:2, 13:19,
13:21, 14:2, 14:5,
14:9, 14:18, 26:20,
26:24
**circuit** [2] - 14:12,
16:15
**Circuit's** [1] - 7:5
**circuits** [4] - 14:15,
26:1, 26:13, 26:15
**circular** [6] - 21:25,
22:1, 22:24, 25:10,
28:1, 28:12
**circumstance** [1] -
24:5
**circumstances** [13] -
8:16, 13:24, 18:18,
23:15, 24:12, 24:17,
24:18, 32:19, 36:17,
45:3, 45:17, 53:5,
56:15
**cite** [1] - 26:3
**cited** [4] - 16:14,
45:6, 56:10, 61:3
**cites** [1] - 45:21
**citing** [1] - 45:8
**civil** [22] - 16:2, 16:6,
16:7, 17:8, 17:9,
17:10, 17:11, 21:4,
22:25, 23:2, 23:9,
24:2, 24:7, 24:10,
24:14, 30:10, 30:15,
31:13, 46:25, 52:1,
61:19
**claim** [1] - 65:9
**claims** [2] - 18:9,
33:15
**clarifying** [1] - 66:12
**clash** [1] - 22:17
**clear** [5] - 8:22,
16:16, 23:7, 29:18,

38:16
**clearly** [3] - 7:24,
16:14, 31:5
**clerk** [1] - 62:19
**Clerk** [1] - 64:16
**climb** [1] - 41:1
**climbed** [2] - 22:20,
41:6
**climbing** [1] - 29:21
**close** [2] - 3:25,
32:24
**closest** [2] - 33:5,
45:22
**cocaine** [1] - 5:11
**collection** [1] - 60:24
**collective** [1] - 48:1
**collectively** [1] -
20:10
**college** [1] - 4:7
**College** [3] - 30:9,
56:23, 61:21
**Columbia** [3] - 1:23,
64:16, 67:13
**COLUMBIA** [1] - 1:1
**combat** [2] - 45:23,
46:19
**combined** [2] - 5:2,
50:1
**coming** [5] - 2:19,
29:20, 29:22, 29:23,
52:13
**commencement** [1]
- 64:6
**commentary** [32] -
6:11, 6:16, 6:21, 7:2,
7:6, 7:8, 7:20, 9:1,
9:4, 10:1, 10:18,
11:12, 11:14, 11:19,
12:3, 12:4, 12:8,
12:12, 14:1, 14:7,
14:11, 14:20, 18:22,
19:6, 25:24, 26:5,
26:8, 26:21, 26:24,
26:25, 27:7, 27:8
**commented** [1] -
26:14
**Commission** [5] -
6:20, 6:24, 6:25, 12:3,
20:1
**commit** [34] - 6:9,
8:18, 9:10, 10:4, 10:8,
10:17, 10:20, 10:25,
12:5, 14:19, 15:3,
16:12, 16:16, 17:10,
18:11, 18:19, 19:22,
20:12, 20:19, 21:22,
22:3, 23:11, 24:4,
24:10, 24:20, 25:6,
27:15, 27:25, 28:5,
28:15, 30:8, 30:14,

43:4, 60:13
**committed** [12] - 6:8,
11:3, 22:5, 22:25,
24:9, 24:19, 25:5,
33:9, 42:7, 42:16,
57:19, 59:10
**committing** [1] -
24:2
**common** [2] - 18:13,
18:21
**commonly** [1] -
16:22
**communicates** [1] -
44:2
**community** [3] -
34:16, 34:18, 50:22
**company** [1] - 50:15
**comparable** [1] -
44:25
**comparator** [1] -
45:11
**comparators** [1] -
47:16
**compare** [1] - 37:22
**complete** [1] - 67:6
**completed** [1] -
35:14
**completely** [2] -
6:17, 14:23
**compliance** [1] -
64:3
**concern** [6] - 21:24,
27:25, 28:11, 29:13,
44:6
**concerned** [3] - 4:20,
22:23, 56:9
**concerns** [3] - 44:10,
56:25, 57:1
**conclude** [1] - 13:23
**concluded** [1] -
66:21
**conclusion** [1] -
28:16
**concrete** [1] - 23:3
**concurrent** [5] - 5:5,
59:13, 66:14, 66:16,
66:18
**concurrently** [1] -
59:19
**condition** [2] - 28:13,
35:17
**conditions** [4] -
39:12, 60:7, 60:8,
64:3
**conduct** [24] - 4:5,
11:6, 15:3, 15:8, 22:2,
22:3, 22:4, 22:6, 22:9,
23:14, 28:14, 29:18,
31:4, 32:5, 37:23,
44:21, 46:10, 47:4,

47:5, 53:16, 55:10,
56:14, 57:6, 60:11
**confess** [1] - 24:12
**Congress** [13] - 6:25,
8:25, 9:7, 9:16, 14:20,
17:4, 30:9, 42:25,
47:1, 49:17, 49:19,
53:9, 57:15
**congressional** [1] -
56:19
**connection** [1] -
65:12
**conscious** [1] -
22:18
**consensus** [1] -
61:12
**consequence** [1] -
36:21
**consequences** [3] -
34:2, 34:6, 36:18
**consider** [11] - 19:4,
20:23, 31:25, 32:20,
32:21, 34:12, 36:18,
43:12, 48:15, 56:6,
58:3
**consideration** [4] -
44:14, 55:24, 59:7,
61:4
**considered** [4] - 9:4,
12:8, 42:6, 57:24
**considering** [5] -
13:22, 19:21, 21:21,
39:20, 62:9
**consistency** [1] -
44:22
**consistent** [3] -
26:17, 27:4, 33:7
**constantly** [1] -
54:14
**constituted** [1] -
31:5
**constitutes** [2] -
9:25, 67:4
**Constitution** [4] -
1:24, 12:14, 26:16,
67:14
**constitutional** [1] -
56:22
**construction** [1] -
8:1
**consultation** [1] -
63:18
**contact** [3] - 8:17,
9:16, 28:21
**contained** [1] - 28:25
**contend** [1] - 15:4
**contention** [1] - 25:3
**contested** [1] - 5:6
**contesting** [1] - 21:8
**context** [7] - 13:22,

19:9, 28:5, 33:12, 42:15, 43:20, 48:8
**continue** [5] - 32:9, 35:12, 45:17, 50:14, 56:22
**continued** [4] - 5:10, 51:19, 53:12, 54:5
**continues** [1] - 13:25
**continuing** [1] - 53:14
**contrast** [1] - 46:18
**contributed** [3] - 49:21, 52:1, 61:20
**contributor** [1] - 49:8
**contrition** [2] - 54:10, 55:25
**control** [4] - 26:8, 36:7, 60:2
**controlled** [2] - 60:15, 60:18
**conversations** [1] - 34:13
**convicted** [1] - 61:12
**conviction** [6] - 11:7, 16:2, 27:11, 59:21, 59:22, 65:7
**convictions** [1] - 64:15
**convinced** [1] - 15:1
**cookout** [1] - 34:19
**cooperate** [1] - 60:24
**cop** [1] - 54:21
**correct** [5] - 5:14, 21:10, 41:23, 46:8, 61:4
**cost** [4] - 64:12, 65:2, 65:4, 65:13
**counsel** [19] - 2:6, 3:9, 3:11, 4:15, 5:6, 5:19, 5:22, 24:24, 25:7, 26:13, 27:19, 28:2, 29:13, 30:22, 58:12, 59:12, 62:7, 65:10, 65:21
**count** [2] - 16:3, 55:3
**Count** [12] - 10:16, 15:3, 15:4, 25:22, 28:18, 30:19, 30:20, 59:13, 59:15, 61:19
**counted** [1] - 55:23
**counting** [1] - 11:9
**country** [4] - 43:18, 45:19, 49:3, 58:2
**Counts** [5] - 29:6, 59:14, 59:18, 59:19, 66:13
**counts** [6] - 5:1, 23:19, 28:18, 29:11, 66:15
**couple** [4] - 2:11,

16:14, 36:8, 38:10
**course** [4] - 11:6, 40:7, 41:4, 41:11
**COURT** [58] - 1:1, 2:1, 2:14, 2:19, 2:23, 3:6, 6:1, 6:10, 6:12, 7:8, 7:13, 8:9, 9:9, 10:13, 10:21, 11:1, 11:8, 12:7, 12:11, 13:8, 13:12, 13:20, 15:1, 15:13, 15:19, 16:9, 16:20, 16:24, 17:2, 17:14, 18:3, 18:6, 23:24, 24:21, 33:17, 33:22, 35:8, 36:2, 36:5, 37:12, 37:15, 37:18, 38:13, 39:4, 39:6, 39:8, 39:13, 39:16, 47:14, 47:20, 48:10, 51:1, 51:9, 65:21, 65:25, 66:4, 66:16, 66:18
**court** [5] - 4:11, 16:24, 28:7, 36:24, 62:19
**Court** [77] - 1:22, 1:23, 2:10, 4:19, 7:16, 7:24, 9:23, 9:25, 11:12, 12:11, 12:25, 14:17, 15:17, 17:12, 17:21, 20:21, 21:2, 21:6, 21:8, 21:12, 22:11, 22:23, 23:16, 23:22, 24:6, 24:18, 25:20, 25:24, 26:4, 26:10, 28:24, 30:22, 31:25, 32:15, 32:16, 32:20, 32:21, 32:23, 33:5, 34:12, 35:11, 35:24, 36:13, 36:18, 37:6, 38:7, 38:14, 38:20, 39:21, 40:5, 42:13, 42:14, 43:14, 44:13, 45:20, 47:10, 47:24, 48:13, 48:14, 55:8, 56:5, 59:9, 60:2, 60:22, 61:13, 62:6, 63:25, 64:6, 64:8, 64:16, 64:20, 64:24, 65:3, 66:6, 66:20, 67:12, 67:13
**Court's** [7] - 21:1, 21:24, 24:22, 27:5, 29:12, 43:23, 44:6
**COURTROOM** [3] - 2:2, 66:11, 66:17
**courts** [2] - 12:21, 12:24, 17:16, 50:5
**Courts** [1] - 13:25
**cover** [2] - 18:10,

19:12
**creates** [1] - 31:3
**creating** [1] - 34:21
**credit** [7] - 5:9, 7:9, 7:12, 7:19, 59:24, 63:3
**Creek** [14] - 15:14, 15:15, 21:2, 28:22, 29:9, 37:25, 45:21, 45:22, 45:24, 45:25, 46:7, 46:9, 46:11, 56:16
**creek** [1] - 38:2
**crime** [4] - 18:19, 19:23, 22:5, 33:9
**crimes** [3] - 43:18, 55:19, 60:13
**Criminal** [4] - 1:3, 2:3, 4:23, 30:18
**criminal** [6] - 4:24, 4:25, 18:17, 19:13, 36:25, 44:3
**cross** [8] - 19:14, 20:15, 20:22, 20:23, 21:18, 23:15, 27:21, 32:10
**cross-reference** [6] - 20:15, 20:22, 20:23, 21:18, 23:15, 27:21
**cross-references** [1] - 19:14
**crossed** [1] - 32:9
**crowd** [6] - 22:7, 22:21, 24:13, 29:24, 41:3, 47:6
**CRR** [3] - 1:22, 67:3, 67:12
**custody** [1] - 59:10

## D

**d)** [1] - 9:6
**D-E-V-E-N-S** [1] - 39:5
**D.C** [8] - 1:6, 1:15, 1:25, 26:23, 36:9, 37:15, 67:14
**damage** [6] - 38:17, 38:25, 48:1, 48:5, 61:10, 61:23
**damages** [1] - 61:18
**danger** [1] - 52:21
**dangerous** [4] - 8:25, 9:12, 10:5, 27:14
**date** [2] - 5:9, 26:2
**Dated** [1] - 67:10
**daylight** [1] - 42:3
**days** [5] - 40:18,

60:20, 63:24, 64:6, 64:25
**deadly** [1] - 18:20
**deal** [2] - 34:23, 45:4
**dealing** [1] - 37:21
**deals** [1] - 6:23
**december** [1] - 1:6
**decide** [3] - 8:2, 11:20, 17:21
**decided** [8] - 9:23, 11:21, 14:12, 14:16, 26:15, 31:24, 40:20, 49:11
**decides** [1] - 35:24
**deciding** [2] - 7:17, 38:7
**decision** [14] - 4:14, 5:20, 7:3, 7:5, 15:13, 15:18, 16:2, 22:19, 23:25, 32:5, 33:7, 48:12, 53:20, 54:14
**decisions** [1] - 26:2
**dedicated** [2] - 34:25, 50:12
**deeply** [1] - 46:7
**defend** [1] - 41:5
**Defendant** [28] - 1:7, 5:14, 5:22, 14:6, 22:7, 22:9, 22:12, 24:3, 24:6, 24:8, 24:19, 25:2, 25:4, 25:15, 25:18, 26:7, 27:16, 28:8, 30:6, 30:12, 40:9, 44:12, 45:12, 45:18, 45:24, 46:21, 46:25, 65:23
**DEFENDANT** [3] - 1:17, 2:22, 48:20
**Defendant's** [7] - 3:18, 3:23, 23:14, 44:8, 45:14, 45:16, 46:10
**Defendants** [8] - 43:25, 45:3, 45:6, 46:13, 46:15, 46:23, 47:2, 61:13
**DEFENDER** [1] - 1:18
**defending** [1] - 40:14
**defense** [9] - 18:8, 18:9, 20:16, 21:6, 21:7, 25:7, 29:13, 30:23, 41:23
**defense's** [3] - 9:18, 19:8, 21:11
**defer** [1] - 27:9
**deference** [10] - 7:4, 7:15, 7:18, 12:21, 12:25, 13:16, 14:7, 14:10, 26:5, 26:21

**define** [1] - 19:10
**defined** [1] - 18:23
**defining** [1] - 28:4
**definition** [9] - 10:11, 18:12, 18:16, 18:25, 19:5, 21:25, 27:6, 27:10, 27:12
**definitions** [3] - 10:23, 12:2, 25:12
**degrees** [2] - 8:25, 9:2
**delay** [1] - 61:18
**delaying** [1] - 61:20
**delegates** [1] - 6:25
**deliberations** [1] - 56:21
**democracy** [1] - 58:1
**demonstrated** [1] - 28:20
**deny** [2] - 53:12
**denying** [1] - 58:20
**depart** [1] - 58:8
**departing** [1] - 43:13
**DEPARTMENT** [1] - 1:14
**department** [1] - 35:19
**dependence** [1] - 59:1
**deploying** [1] - 40:23
**DEPUTY** [3] - 2:2, 66:11, 66:17
**descended** [1] - 48:3
**describe** [1] - 33:1
**designated** [1] - 37:11
**despite** [5] - 4:23, 36:7, 51:20, 55:4, 57:11
**destroy** [3] - 53:22, 53:23, 53:25
**details** [1] - 63:9
**deter** [1] - 55:17
**determination** [2] - 26:21, 62:5
**determine** [7] - 7:24, 13:7, 17:22, 21:10, 21:14, 63:13, 64:8
**determined** [8] - 26:2, 26:3, 27:13, 30:24, 31:2, 50:12, 59:8, 60:22
**deterrence** [7] - 37:4, 40:1, 43:15, 43:16, 44:5, 55:16, 55:20
**DEVENF** [1] - 39:6
**Devens** [3] - 39:2, 39:7, 66:8
**DEVINS** [1] - 39:4

**dictionary** [1] - 18:14
**Dictionary** [1] -
18:16
**died** [1] - 57:18
**difference** [6] - 6:15,
6:22, 7:7, 11:2, 14:8,
14:15
**differences** [5] -
14:14, 19:3, 31:7,
32:17, 44:20
**different** [24] - 6:13,
6:17, 8:19, 13:5, 13:6,
13:10, 17:12, 17:16,
19:16, 20:5, 21:5,
21:20, 24:4, 24:10,
28:16, 32:4, 33:2,
36:16, 37:24, 44:21,
46:16, 56:13, 58:17
**differently** [2] -
10:14, 13:13
**differing** [1] - 56:11
**difficult** [2] - 36:8,
36:15
**directed** [1] - 60:25
**direction** [3] - 21:17,
21:21, 35:19
**directly** [1] - 38:24
**disagree** [2] - 21:11,
29:12
**disagreed** [1] - 9:23
**disagrees** [1] - 26:19
**disappointed** [2] -
48:24, 52:14
**disarray** [1] - 41:22
**disbursement** [1] -
62:18
**discourage** [1] -
43:19
**discuss** [2] - 4:13,
5:13
**discussed** [1] - 28:2
**discusses** [1] - 4:12
**discussions** [1] -
48:11
**dismiss** [1] - 66:2
**dismissed** [1] - 66:5
**disorder** [18] - 16:2,
16:6, 16:7, 17:8, 17:9,
17:10, 17:11, 21:4,
23:1, 23:2, 23:9, 24:3,
24:7, 24:10, 24:15,
30:15, 31:14, 46:25
**disparities** [6] - 40:3,
44:17, 44:19, 47:19,
56:8, 56:12
**dispute** [2] - 15:19,
28:20
**disputing** [1] - 29:3
**distinct** [5] - 13:22,
23:12, 23:13, 28:25,

47:13
**distinction** [2] - 17:6,
31:4
**distinctions** [1] -
25:20
**distinguish** [1] - 15:9
**distinguishable** [1] -
15:8
**distinguished** [3] -
16:13, 23:24, 23:25
**distinguishing** [1] -
29:8
**District** [4] - 1:23,
1:23, 64:16, 67:13
**DISTRICT** [3] - 1:1,
1:1, 1:11
**district** [1] - 35:18,
64:5, 67:13
**disturbance** [1] -
49:14
**division** [1] - 9:7
**divorced** [1] - 14:20
**DNA** [1] - 60:24
**done** [14] - 34:23,
40:14, 44:12, 48:17,
49:11, 54:23, 54:25,
56:3, 56:8, 59:2,
61:11, 61:23, 63:9,
63:14
**double** [1] - 11:9
**double-counting** [1]
- 11:9
**down** [2] - 2:19,
22:20, 23:4, 29:20,
29:22, 29:23, 41:1,
41:3, 41:6, 41:16,
49:1, 50:1, 50:13,
51:12, 51:23, 54:15,
55:14, 58:1, 58:12,
62:21
**downward** [3] - 31:8,
32:17, 58:8
**drinking** [1] - 49:12
**drive** [1] - 23:21
**drug** [8] - 35:8, 44:8,
52:19, 57:2, 58:15,
58:25, 60:20, 60:21
**drugs** [2] - 36:5,
52:20, 58:20
**during** [4] - 31:13,
35:1, 41:21, 42:3
**duties** [1] - 56:22

**E**

**easy** [1] - 45:2
**Edition** [1] - 18:15
**Edwards** [1] - 67:12
**EDWARDS** [2] -

1:22, 67:3
**effect** [1] - 57:22
**effort** [2] - 50:4,
50:23
**eight** [3] - 8:16, 43:2,
43:3
**eight-level** [2] - 43:2,
43:3
**either** [2] - 17:20,
63:5
**election** [3] - 17:4,
17:7, 57:4
**elections** [1] - 43:21
**Electoral** [3] - 30:9,
56:23, 61:21
**elements** [5] - 15:11,
17:9, 22:5, 23:13,
29:1
**elevate** [1] - 21:22
**elevated** [1] - 22:16
**Elon** [3] - 4:3, 50:11,
50:20
**embarrassing** [1] -
49:11
**employed** [2] - 35:3,
62:22
**enabled** [2] - 48:2,
48:4
**encourage** [1] - 39:3
**encourages** [1] -
40:1
**encouraging** [1] -
56:4
**end** [3] - 23:23, 54:9,
61:13
**enforcement** [1] -
54:8
**engage** [1] - 53:22
**engaged** [1] - 30:10
**Enhanced** [1] - 8:23
**enhanced** [1] - 9:21
**enhancement** [3] -
15:16, 43:2, 43:3
**enhancements** [3] -
20:3, 42:14, 43:1
**ensure** [3] - 44:18,
44:22, 47:18
**enter** [1] - 53:19
**entered** [1] - 65:7
**entering** [1] - 65:11
**entitled** [1] - 5:7
**entry** [1] - 65:1
**equated** [1] - 9:11
**equipped** [1] - 44:14
**erroneous** [3] -
12:16, 19:10, 26:17
**escape** [1] - 16:22
**escaped** [1] - 43:23
**especially** [5] -
18:20, 18:25, 43:16,

43:20, 50:11
**ESQ** [2] - 1:14, 1:17
**establish** [1] - 60:10
**et** [2] - 27:15
**evaluate** [1] - 20:23
**evaluating** [1] -
21:18
**events** [4] - 40:6,
40:7, 49:4, 49:22
**eventually** [3] -
29:23, 51:19, 52:18
**evidence** [5] - 6:8,
41:24, 53:25, 54:1,
60:24
**evident** [1] - 57:6
**exact** [6] - 22:14,
28:2, 28:23, 40:24,
43:3, 56:16
**exactly** [3] - 10:19,
11:24, 17:1
**exaggerated** [1] -
33:15
**examination** [1] -
45:16
**example** [1] - 56:16
**excellent** [1] - 39:14
**except** [1] - 57:1
**excessive** [1] - 54:3
**excuse** [2] - 9:5,
49:10
**exercise** [1] - 53:14
**exhibited** [1] - 54:10
**exist** [1] - 13:5
**existence** [1] - 32:1
**expectations** [1] -
60:10
**expected** [1] - 32:6
**expended** [1] - 61:25
**experience** [2] -
35:21, 49:24
**experienced** [1] -
49:18
**explain** [1] - 12:13
**explanation** [1] -
53:6
**explicit** [2] - 12:25,
15:25
**exposure** [1] - 30:19
**express** [1] - 33:25
**expressed** [2] - 33:3,
55:24
**extended** [1] - 52:15
**extent** [2] - 18:13,
27:1
**extreme** [1] - 51:4,
51:7
**extremely** [2] - 40:7,
43:18

**F**

**F.4th** [2] - 14:9, 27:2
**face** [2] - 57:21,
60:16
**faced** [1] - 36:19,
42:24
**facility** [1] - 39:2
**facing** [6] - 34:2,
34:6, 42:9, 42:10,
43:11, 56:2
**fact** [10] - 10:15,
19:13, 35:1, 40:16,
42:2, 43:11, 45:25,
51:7, 51:20, 62:2
**factor** [2] - 29:8,
29:9, 49:8
**factors** [10] - 4:20,
31:7, 31:11, 32:19,
39:20, 42:7, 42:11,
53:1, 53:3
**facts** [5] - 16:15,
22:4, 32:18, 61:7,
62:6
**factual** [4] - 4:16,
24:12, 25:3, 45:3
**factually** [1] - 47:12
**familiar** [2] - 3:17,
40:5
**families** [2] - 49:17,
57:23
**family** [20] - 2:25,
3:3, 4:9, 32:24, 34:13,
34:16, 35:4, 36:20,
39:3, 44:11, 49:2,
49:20, 49:25, 50:10,
51:2, 51:8, 56:24,
58:6, 58:15, 66:9
**family's** [1] - 59:1
**far** [8] - 2:14, 3:7,
24:12, 26:19, 39:18,
42:19, 58:12, 59:25
**father** [2] - 34:25,
50:17
**fault** [1] - 45:8
**FBI** [3] - 33:22, 52:7,
54:6
**fear** [1] - 49:18
**feature** [2] - 20:14,
20:19
**FEDERAL** [1] - 1:17
**federal** [4] - 12:15,
19:1, 26:17, 60:13
**feeds** [1] - 34:18
**felonies** [3] - 21:5,
28:25, 61:12
**felonious** [2] - 27:13,
30:13
**felony** [36] - 6:9,

8:18, 9:11, 10:4, 10:8, 10:17, 10:20, 10:25, 11:3, 11:5, 12:5, 14:19, 15:4, 15:6, 16:4, 16:6, 16:7, 16:13, 16:14, 18:11, 20:12, 20:19, 21:22, 21:23, 22:4, 23:11, 24:20, 25:6, 27:15, 28:1, 28:5, 28:15, 30:8, 30:14, 46:23, 59:21
**felt** [2] - 29:7, 59:12
**few** [2] - 40:12, 57:18
**field** [3] - 3:12, 34:14, 65:15
**FIELD** [1] - 1:20
**Field** [1] - 2:5
**fields** [1] - 48:17
**Fifth** [1] - 14:2
**fight** [2] - 51:24, 53:21
**fighting** [1] - 46:11
**figure** [1] - 61:11
**figures** [2] - 53:11, 53:14
**file** [1] - 65:3
**financial** [3] - 62:9, 62:25, 64:10
**findings** [2] - 5:5, 39:18
**fine** [1] - 3:1
**fines** [2] - 64:9, 64:11
**finished** [1] - 64:21
**first** [17] - 5:19, 7:20, 8:10, 9:7, 9:19, 10:7, 11:20, 13:1, 15:1, 25:19, 33:24, 34:7, 36:22, 38:15, 40:4, 44:24, 45:5
**First** [1] - 14:4
**first-level** [1] - 8:10
**fist** [2] - 31:21, 32:12
**fit** [2] - 27:17, 27:24
**fixing** [1] - 34:17
**fleeing** [1] - 62:1
**FMC** [2] - 39:2, 66:9
**follow** [10] - 9:2, 11:12, 14:17, 25:15, 26:10, 28:23, 44:19, 51:11, 53:3, 63:6
**followed** [3] - 10:18, 13:4, 51:4
**following** [5] - 40:19, 45:18, 49:10, 58:7, 60:7
**follows** [2] - 27:20, 59:5
**food** [1] - 34:21

**footage** [1] - 42:2
**FOR** [4] - 1:1, 1:14, 1:17, 1:20
**force** [1] - 41:3
**forced** [3] - 36:23, 41:8, 62:2
**foregoing** [1] - 67:4
**forget** [2] - 43:3, 48:23
**forms** [1] - 35:13
**forth** [1] - 39:20
**forward** [2] - 2:6, 35:25
**four** [4] - 9:3, 32:24, 42:19, 57:17
**Fourth** [1] - 13:21
**frankly** [1] - 57:2
**fraud** [2] - 7:6, 11:14
**fray** [1] - 41:21
**freedom** [1] - 50:9
**frequently** [1] - 45:6
**Friedrich** [4] - 21:3, 21:14, 28:24, 46:1
**Friedrich's** [1] - 15:13
**friend** [1] - 51:14
**friend's** [1] - 50:15
**friends** [2] - 49:2, 52:6
**front** [3] - 22:21, 29:24, 62:2
**frontal** [1] - 25:24
**full** [1] - 67:5
**fully** [2] - 21:13
**fun** [1] - 40:21
**future** [1] - 43:19

**G**

**gas** [2] - 51:17, 61:25
**general** [5] - 25:11, 43:15, 47:24, 57:4
**generally** [3] - 35:18, 55:17, 62:20
**genuine** [2] - 7:24, 8:2
**genuinely** [3] - 7:22, 9:24, 26:11
**girlfriend** [5] - 4:3, 32:25, 34:13, 35:2, 50:19
**given** [15] - 7:9, 7:11, 7:15, 14:10, 18:25, 24:17, 26:5, 26:9, 26:21, 27:8, 38:18, 45:7, 47:15, 48:4, 55:7
**goals** [3] - 37:3, 39:10, 39:24

**government** [1] - 40:8
**Government** [27] - 2:7, 15:24, 17:18, 18:7, 18:12, 19:25, 20:17, 22:1, 23:17, 24:17, 24:25, 27:19, 28:20, 33:14, 37:24, 39:21, 44:7, 45:21, 45:25, 46:5, 46:14, 47:9, 47:17, 47:24, 48:5, 53:2, 61:1
**GOVERNMENT** [1] - 1:14
**Government's** [8] - 3:14, 22:11, 22:24, 38:11, 39:17, 44:18, 45:9, 61:5
**gradations** [2] - 20:5, 20:7
**granted** [4] - 14:6, 24:5, 50:10
**grateful** [1] - 50:3
**great** [7] - 34:23, 35:4, 35:23, 36:20, 38:19, 45:4
**greater** [2] - 11:16, 40:22
**greatest** [1] - 36:21
**grounds** [2] - 54:2, 58:24
**group** [1] - 23:19
**grow** [3] - 52:22, 52:23, 58:18
**guard** [1] - 16:24
**guideline** [39] - 4:17, 5:3, 5:14, 5:16, 6:3, 6:4, 6:16, 6:20, 7:6, 7:21, 8:4, 8:6, 9:1, 9:5, 9:24, 10:17, 11:15, 11:20, 11:21, 12:13, 12:16, 13:9, 14:22, 15:20, 17:25, 24:22, 24:23, 25:4, 25:8, 25:11, 28:25, 29:3, 29:14, 30:16, 30:25, 31:2, 37:21, 43:8
**guidelines** [65] - 5:17, 5:21, 6:23, 7:1, 12:8, 12:13, 13:13, 13:15, 14:1, 14:6, 14:7, 14:11, 14:16, 17:15, 17:22, 17:24, 18:22, 19:6, 19:10, 19:12, 19:15, 19:19, 20:3, 20:10, 21:10, 21:15, 21:21, 22:2, 23:18, 23:20, 25:9, 26:14, 26:15, 26:18,

26:22, 26:25, 28:6, 30:18, 30:21, 31:9, 32:14, 34:8, 39:22, 39:24, 42:10, 42:12, 43:2, 43:6, 43:13, 44:20, 44:21, 44:24, 46:3, 46:4, 47:17, 48:12, 55:4, 56:5, 58:9, 58:24, 59:8, 60:9
**Guidelines** [1] - 20:1
**guidelines'** [2] - 20:22, 26:4
**guilty** [14] - 5:2, 10:15, 11:5, 17:3, 17:7, 17:8, 24:6, 28:9, 31:15, 31:22, 36:13, 46:25, 65:11, 65:23
**gun** [2] - 16:18, 16:20

**H**

**half** [1] - 41:4
**Hamner** [9] - 4:10, 16:1, 21:20, 23:24, 24:13, 25:21, 28:7, 29:9
**HANA** [1] - 1:20
**Hana** [1] - 2:5
**hand** [4] - 31:20, 33:10, 46:19
**hand-to-hand** [1] - 46:19
**handing** [1] - 34:20
**hands** [1] - 47:8
**HANYE** [42] - 1:17, 2:17, 3:4, 5:25, 6:2, 6:11, 6:13, 7:11, 7:14, 8:10, 9:10, 10:19, 10:22, 11:4, 11:10, 12:10, 12:20, 13:10, 13:14, 14:14, 15:7, 15:15, 15:23, 16:10, 16:21, 17:1, 17:5, 31:1, 33:18, 33:24, 35:11, 36:4, 36:11, 37:14, 37:16, 37:19, 38:15, 39:5, 39:7, 39:9, 39:15, 66:10
**Hanye** [6] - 2:17, 2:19, 3:21, 5:23, 44:15, 65:10
**happy** [3] - 23:22, 47:11, 57:5
**hard** [4] - 52:18, 54:20, 56:10
**harm** [2] - 10:6, 49:17

**harsh** [1] - 37:7
**health** [2] - 63:16, 63:17
**hear** [12] - 3:1, 3:9, 4:15, 5:19, 14:14, 17:18, 21:24, 30:22, 39:17, 48:18, 55:13
**heard** [1] - 48:11
**hearing** [2] - 64:1
**HEARING** [1] - 1:10
**heart** [2] - 49:8, 49:7
**heartache** [1] - 50:19
**heartfelt** [1] - 49:16
**heavily** [1] - 45:19
**held** [1] - 4:10
**help** [4] - 35:6, 53:23, 56:5, 63:21
**hereby** [1] - 67:3
**hesitate** [1] - 51:7
**high** [1] - 59:11
**higher** [5] - 15:19, 23:20, 31:2, 42:9, 42:21
**highlighted** [1] - 21:2
**highlights** [1] - 41:23
**Hill** [2] - 51:15
**Hillard's** [1] - 4:2
**himself** [3] - 36:13, 38:17, 44:12
**History** [2] - 4:23, 30:18
**history** [6] - 4:25, 25:8, 36:25, 55:1, 56:25, 58:1
**HOGAN** [1] - 1:10
**hold** [1] - 50:11
**holdings** [1] - 13:22
**homeless** [1] - 34:18
**honest** [1] - 36:2
**Honor** [18] - 2:2, 2:8, 2:17, 2:22, 5:25, 18:2, 20:21, 31:1, 38:10, 39:11, 39:15, 39:19, 42:7, 47:22, 48:20, 65:17, 66:10, 66:11
**HONORABLE** [1] - 1:10
**hope** [2] - 2:10, 63:9
**hopeful** [1] - 35:23
**hopefully** [1] - 51:11
**horrible** [1] - 57:12
**horror** [1] - 57:11
**hotel** [2] - 42:3, 51:19
**hour** [1] - 41:4
**hours** [2] - 42:4, 56:19
**house** [1] - 34:24
**huge** [1] - 29:24

hundreds [1] - 32:2
hungry [1] - 34:19
hurtful [1] - 53:15
hypertechnical [1] - 15:11
hypothetical [1] - 17:12

**I**

idea [1] - 49:4
identified [1] - 17:16
illegally [1] - 54:3
immediate [1] - 33:16
immediately [1] - 40:19
impeding [1] - 5:15
implement [1] - 19:20
implementing [1] - 19:11
important [7] - 12:23, 17:6, 32:8, 33:6, 34:20, 37:3, 38:6
importantly [1] - 49:3
impose [3] - 39:21, 59:20, 64:9
imposed [7] - 30:24, 45:8, 55:6, 60:10, 64:24, 65:7, 66:14
inappropriate [3] - 10:18, 25:14, 27:17
incarcerated [2] - 45:14, 45:15
incarceration [5] - 31:16, 37:1, 46:14, 63:23, 63:24
inclined [1] - 38:21
include [3] - 8:3, 11:22, 11:24
includes [1] - 11:15
including [3] - 40:15, 52:3, 64:18
inconsistent [1] - 12:15
incorrectly [2] - 5:16, 43:24
increase [1] - 20:8
increases [2] - 20:4, 20:6
increasing [1] - 4:25
incur [1] - 63:3
incurred [1] - 45:19
independent [2] - 15:5, 21:9
indicated [3] - 51:16,

56:1, 64:14
indictment [5] - 29:11, 65:24, 66:1, 66:4, 66:5
individual [5] - 45:3, 53:16, 53:18, 55:10, 56:7
individually [1] - 53:18
ineffective [1] - 65:9
influence [1] - 38:19
information [2] - 63:1, 65:8
informed [1] - 24:15
informing [1] - 20:23
injured [2] - 42:8, 57:13
injury [15] - 8:24, 9:12, 9:14, 10:5, 18:20, 19:24, 20:7, 20:8, 20:11, 20:18, 20:20, 27:14, 32:13, 45:12, 45:18
inpatient [2] - 52:16, 63:5
insofar [1] - 25:2
instances [1] - 20:13
instead [1] - 18:5
instructed [2] - 30:3, 30:5
integrity [1] - 43:21
intelligent [1] - 48:16
intended [6] - 11:15, 11:16, 11:22, 11:24, 12:4, 23:11
intending [1] - 61:17
intent [36] - 6:9, 8:18, 9:10, 10:4, 10:8, 10:17, 10:20, 10:25, 11:2, 12:2, 12:4, 12:5, 14:19, 15:3, 16:12, 16:16, 16:19, 17:10, 18:11, 18:18, 18:19, 19:22, 20:12, 20:19, 21:22, 22:3, 22:25, 23:9, 24:3, 24:9, 25:6, 27:15, 27:25, 28:5, 28:15, 30:7
intent-based [1] - 12:4
intention [1] - 24:19, 49:22
intentional [1] - 17:11
intentionally [1] - 40:9
interaction [3] - 34:21, 54:8, 54:9
interested [1] - 47:10
interesting [1] -

17:14
interfere [1] - 17:3
interfering [2] - 17:7, 30:8
internet [1] - 51:5
interpret [3] - 8:5, 9:19, 29:14
interpretation [5] - 7:10, 8:12, 10:1, 26:6, 27:18
interpreted [3] - 4:18, 12:13, 27:16
interpreting [3] - 12:22, 13:16, 26:24
interprets [2] - 7:18, 27:1
interrupt [1] - 45:14
interruption [1] - 53:9
interview [1] - 33:22, 33:25
invested [1] - 50:4
investing [1] - 50:22
invite [1] - 51:8
involve [2] - 9:12, 46:24
involved [5] - 27:14, 46:11, 46:19, 50:23, 51:15
involvement [1] - 36:24
involves [1] - 10:7
involving [8] - 19:23, 19:24, 20:11, 20:17, 20:18, 45:23
Island [1] - 37:8
issue [12] - 5:12, 5:14, 5:24, 6:14, 6:15, 7:22, 15:17, 21:12, 24:22, 25:8, 35:12, 44:16
issued [1] - 21:1
issues [3] - 4:24, 38:10
itself [8] - 6:16, 6:23, 7:21, 9:20, 11:20, 14:20, 14:21, 38:5

**J**

Jackson [16] - 4:11, 5:18, 6:14, 10:10, 14:25, 15:10, 16:1, 21:1, 21:17, 24:1, 24:11, 28:8, 28:13, 29:7, 45:7, 45:11
Jackson's [3] - 11:1, 23:25, 25:21
jail [6] - 36:7, 53:20,

56:2, 58:22, 60:5, 60:14
Jail [1] - 36:9
January [12] - 22:10, 32:23, 33:16, 40:6, 42:15, 43:16, 43:24, 45:1, 45:4, 48:22, 49:9, 67:10
Jenkins [1] - 27:2
job [3] - 39:14, 50:16, 65:11
join [6] - 23:9, 40:20, 41:20, 54:15, 57:4, 62:3
joined [6] - 40:9, 51:24, 55:13, 55:14, 56:17, 57:8
joining [2] - 29:20, 29:23
Josh [1] - 2:17
JOSHUA [1] - 1:17
Jr.'s [1] - 4:6
JUDGE [1] - 1:11
judge [1] - 50:5
Judge [25] - 4:10, 5:18, 6:14, 10:10, 11:1, 14:24, 15:9, 15:13, 15:24, 16:1, 21:1, 21:2, 21:13, 21:17, 23:25, 24:1, 24:11, 25:21, 28:8, 28:13, 28:24, 29:7, 45:7, 45:11, 46:1
judges [1] - 55:8, 56:13
judgment [2] - 59:9, 65:1
judicial [1] - 39:1
jumped [1] - 54:19
jumps [1] - 8:23
justice [1] - 43:5
JUSTICE [1] - 1:14
justify [3] - 53:13, 61:7, 61:8

**K**

keep [5] - 2:10, 2:14, 43:14, 52:14, 60:2
kept [1] - 32:12
Kerissa [1] - 4:2
kicked [1] - 38:3
kind [3] - 31:22, 34:22, 47:6
kinds [1] - 56:13
Kisor [17] - 7:3, 7:14, 7:23, 12:23, 13:4, 13:8, 13:23, 14:4, 14:5, 14:10, 14:16,

14:18, 26:7, 26:9, 26:12, 26:20, 27:9
KISOR [1] - 26:9
knowing [1] - 34:1
knowledge [1] - 23:7

**L**

lack [2] - 29:7, 47:15
ladder [3] - 23:5, 41:1, 41:6
Lagos [1] - 14:3
laid [2] - 13:6, 14:21
last [4] - 27:16, 33:21, 37:14, 63:21
lately [1] - 36:9
latest [2] - 12:20, 61:11
law [6] - 18:14, 37:5, 54:8, 55:3, 55:6, 62:5
Law [1] - 18:15
lawbreakers [1] - 43:20
lawyer [1] - 65:4
lead [3] - 19:17, 58:4, 58:17
learned [1] - 50:7
least [5] - 35:18, 35:25, 37:10, 54:18, 58:4
leave [2] - 31:24, 38:18
led [1] - 50:1
Leffingwell [1] - 21:16, 38:4, 45:6, 45:9, 45:11
left [2] - 50:2, 53:25
legal [4] - 4:16, 18:13, 18:21, 50:1
legislative [1] - 26:11
length [1] - 58:11
less [6] - 19:23, 37:25, 38:1, 38:21, 38:23, 44:14
letter [4] - 3:25, 4:2, 4:4, 4:6
letters [5] - 3:23, 32:24, 34:12, 51:2, 51:16
level [13] - 4:22, 8:10, 9:15, 9:17, 20:4, 20:6, 20:9, 26:21, 30:17, 42:13, 43:2, 43:3, 43:7
levels [3] - 8:13, 8:19, 42:19
Lewis [1] - 14:4
life [3] - 52:20, 58:5,

58:17
**lifetime** [1] - 58:20
**light** [1] - 56:7
**likely** [4] - 23:3,
41:20, 42:24, 44:8
**likewise** [1] - 21:16
**limits** [1] - 12:24
**line** [12] - 2:25, 3:1,
6:18, 6:19, 22:16,
23:4, 29:24, 32:9,
41:7, 41:19, 53:4,
62:2
**lines** [2] - 32:10, 63:3
**LISA** [2] - 1:22, 67:3
**Lisa** [1] - 67:12
**live** [5] - 52:22,
57:20, 58:17, 63:10,
64:19
**lives** [1] - 49:20
**local** [1] - 60:13
**location** [1] - 46:10
**look** [10] - 8:8, 8:13,
9:20, 15:23, 18:14,
19:13, 20:2, 44:23,
44:25, 53:16
**looked** [2] - 40:20,
46:7
**looking** [5] - 18:15,
21:21, 24:2, 45:2,
56:14
**loss** [9] - 11:15,
11:16, 11:21, 11:22,
11:24, 12:4
**lost** [1] - 51:18
**loved** [1] - 49:21
**loving** [1] - 34:25
**low** [1] - 45:7
**lower** [10] - 17:24,
17:25, 22:13, 22:15,
28:9, 35:7, 41:8,
41:12, 46:4, 59:12

## M

**Maced** [1] - 54:19
**magnitude** [1] - 49:6
**maintain** [2] - 35:15,
50:12
**majority** [2] - 25:25,
26:14
**man** [4] - 17:3,
36:24, 48:16, 55:2
**mandatory** [3] -
60:4, 60:7, 60:12
**manner** [2] - 23:10,
44:9
**manual** [1] - 12:13
**masonry** [1] - 50:15
**mass** [1] - 55:12

**Massachusetts** [5] -
1:19, 37:8, 39:3, 64:4,
66:9
**matches** [1] - 12:6
**matter** [10] - 3:8,
4:18, 30:24, 31:18,
33:18, 47:13, 52:18,
55:11, 61:2, 65:20
**Matter** [1] - 2:3
**matters** [15] - 6:19,
25:3, 25:6, 31:20,
31:21, 31:23, 32:11,
33:12, 35:5, 37:2,
41:22, 44:3, 44:4,
56:15
**max** [1] - 8:23
**maximum** [1] - 17:25
**mean** [5] - 3:19,
9:19, 30:16, 44:8,
58:18
**meaning** [2] - 15:12,
28:4
**meaningful** [1] -
32:17
**means** [1] - 16:11
**meant** [2] - 19:12,
26:4
**media** [9] - 22:14,
22:20, 29:21, 40:19,
51:5, 51:23, 54:5,
54:15, 56:1
**meet** [1] - 60:3
**meetings** [1] - 51:8
**members** [6] - 3:1,
32:24, 49:19, 49:20,
51:3, 57:16
**memo** [3] - 6:13,
6:21, 38:12
**memorandum** [6] -
3:14, 3:19, 3:20, 3:22,
5:13, 45:21
**mental** [2] - 63:16,
63:17
**mentality** [1] - 32:1
**mention** [1] - 6:21
**mentioned** [2] -
25:10, 45:24
**mess** [1] - 50:19
**message** [2] - 43:17,
44:2
**met** [2] - 7:16, 43:19
**MICHAEL** [1] - 1:14
**Michael** [1] - 2:8
**middle** [2] - 9:15,
22:15
**midpoint** [1] - 39:23
**midst** [1] - 62:1
**might** [3] - 13:5,
19:2, 46:6
**military** [1] - 45:13

**million** [1] - 61:10
**mind** [3] - 2:10,
43:14, 54:22
**minimize** [2] - 34:3,
56:12
**minimum** [1] - 22:23
**minutes** [2] - 23:5,
40:13
**misdemeanor** [1] -
59:22
**misinformation** [1] -
51:6
**missed** [1] - 30:3
**mistaken** [2] - 46:4,
46:6
**mitigating** [2] - 42:6,
56:15
**mob** [4] - 31:25,
40:9, 40:10, 48:4
**model** [1] - 50:17
**moderate** [1] - 31:9
**moment** [4] - 22:5,
22:7, 41:8, 41:21
**moments** [1] - 34:1
**monies** [1] - 64:14
**month** [4] - 5:9,
37:11, 62:21
**months** [27] - 5:4,
17:25, 18:1, 30:19,
31:10, 33:21, 33:23,
36:8, 37:22, 38:5,
38:9, 39:10, 39:24,
43:9, 46:22, 52:7,
56:17, 58:10, 59:4,
59:11, 59:13, 59:14,
59:17, 59:18, 59:24
**months'** [1] - 59:23
**morning** [10] - 2:1,
2:2, 2:8, 2:11, 2:17,
2:22, 2:24, 37:19,
49:6, 52:5
**Moses** [1] - 13:21
**mosquito** [1] - 52:11
**most** [6] - 9:17,
12:23, 16:10, 18:24,
41:10, 49:22
**mother** [6] - 3:4, 4:3,
32:24, 34:14, 50:20,
51:3
**mother's** [2] - 3:24,
34:24
**motivated** [1] - 34:2
**motivation** [1] -
58:18
**move** [2] - 35:25,
66:2
**moved** [2] - 22:21,
29:24
**movement** [1] - 36:9
**MR** [52] - 2:8, 2:17,

3:4, 5:25, 6:2, 6:11,
6:13, 7:11, 7:14, 8:10,
9:10, 10:19, 10:22,
11:4, 11:10, 12:10,
12:20, 13:10, 13:14,
14:14, 15:7, 15:15,
15:23, 16:10, 16:21,
17:1, 17:5, 18:2, 18:4,
18:7, 24:1, 31:1,
33:18, 33:24, 35:11,
36:4, 36:11, 37:14,
37:16, 37:19, 38:15,
39:5, 39:7, 39:9,
39:15, 39:19, 47:15,
47:22, 65:20, 65:22,
66:1, 66:10
**multiple** [2] - 19:16,
55:9
**must** [3] - 60:15,
60:18, 63:4

## N

**names** [1] - 47:10
**Nasir** [2] - 14:9,
26:20
**NASIR** [1] - 14:9
**nature** [6] - 32:18,
39:25, 44:3, 47:5,
48:1, 53:5
**near** [1] - 66:9
**nearby** [1] - 32:3
**nearly** [1] - 32:22
**necessarily** [2] -
46:24, 47:4
**necessary** [3] -
35:20, 38:7, 41:18
**necessity** [1] - 37:7
**Neck** [2] - 37:10,
37:12
**need** [8] - 34:19,
34:22, 43:14, 43:15,
45:17, 47:12, 55:16,
65:16
**needed** [2] - 33:10,
36:15
**needing** [1] - 19:5
**needs** [2] - 18:25,
43:14
**never** [6] - 7:11,
34:1, 34:7, 49:14,
49:22, 50:13
**nevertheless** [1] -
13:25
**new** [4] - 29:14,
58:19, 63:3, 65:8
**next** [4] - 49:5, 52:5,
57:11, 60:17
**nightmare** [1] -

48:23
**nonetheless** [2] -
21:8, 23:19
**normal** [1] - 18:22
**Northern** [2] - 37:10,
37:12
**Northwest** [3] - 1:15,
1:24, 67:14
**notably** [1] - 21:20
**note** [1] - 13:20
**noted** [2] - 21:6,
37:6, 45:11
**notes** [2] - 12:8, 67:5
**nothing** [3] - 7:2,
28:4, 51:13
**notice** [1] - 43:23
**noting** [2] - 21:3,
22:2
**numb** [1] - 37:2
**number** [10] - 18:8,
18:25, 40:15, 40:17,
43:3, 44:25, 46:12,
46:24, 48:2, 56:11

## O

**object** [2] - 37:22,
38:3
**objection** [6] - 4:15,
4:16, 4:17, 15:21,
24:24, 24:25
**objections** [1] - 4:12
**objects** [1] - 25:2
**obligation** [1] - 21:9
**observe** [1] - 40:16
**obstruct** [2] - 61:18,
63:14
**obstructing** [2] -
5:15, 20:13
**obstruction** [7] - 6:3,
14:22, 25:17, 29:17,
42:25, 43:5, 47:1
**obviously** [10] - 3:8,
4:14, 4:19, 25:22,
29:19, 31:12, 39:11,
48:16, 51:23, 54:13
**occurred** [1] - 53:12
**OF** [5] - 1:1, 1:3,
1:10, 1:14, 1:17
**offense** [22] - 4:22,
15:5, 16:22, 20:4,
20:6, 20:9, 28:12,
30:8, 30:15, 31:14,
31:22, 40:1, 40:4,
42:8, 42:13, 42:19,
43:6, 44:9, 53:5, 55:5,
55:7, 55:11
**offenses** [8] - 20:17,
20:18, 28:14, 40:2,

42:16, 46:16, 55:4, 65:12
**office** [11] - 2:12, 4:23, 60:8, 60:23, 60:25, 62:15, 62:25, 63:7, 63:19, 64:2, 64:17
**OFFICE** [1] - 1:17
**OFFICER** [1] - 65:17
**officer** [16] - 3:13, 8:7, 16:21, 21:5, 22:8, 23:9, 25:17, 29:17, 29:25, 30:3, 31:13, 42:8, 47:7, 54:17, 57:9, 61:17
**officers** [19] - 5:15, 20:13, 22:22, 32:2, 38:3, 40:14, 41:4, 41:7, 41:9, 42:17, 46:20, 47:6, 47:7, 48:4, 49:17, 49:19, 52:2, 57:13, 62:1
**offices** [1] - 64:19
**Official** [1] - 1:22
**official** [1] - 67:12
**Oklahoma** [1] - 37:8
**older** [1] - 52:24
**oldest** [2] - 4:6, 50:20
**once** [3] - 56:20, 57:10, 62:21
**one** [20] - 13:21, 14:8, 14:21, 14:24, 19:18, 23:17, 24:11, 27:16, 31:9, 31:14, 32:19, 35:2, 46:19, 53:8, 53:18, 54:9, 58:2, 60:20, 65:5, 65:20
**ones** [2] - 49:21, 60:12
**online** [1] - 49:9
**open** [1] - 31:20
**operation** [1] - 30:11
**opinion** [1] - 20:25
**opinions** [1] - 33:3
**opportunity** [1] - 48:13
**opposed** [2] - 18:1, 31:21
**opposite** [1] - 56:1
**opposition** [1] - 62:7
**options** [1] - 60:9
**oral** [1] - 47:23
**order** [4] - 38:21, 47:24, 48:6, 48:9
**ordered** [1] - 38:20
**original** [3] - 10:14, 66:1, 66:4
**otherwise** [2] -

23:23, 58:21
**outlier** [2] - 9:11, 45:10
**outnumbered** [1] - 40:17
**outpatient** [2] - 52:16, 63:5
**outstanding** [1] - 66:2
**overall** [4] - 26:1, 27:20, 43:6, 50:18
**overcome** [2] - 58:16, 62:7
**overruled** [1] - 27:9
**own** [10] - 7:18, 12:18, 12:22, 13:3, 13:17, 26:10, 42:2, 53:10, 58:3

## P

**paid** [6] - 3:25, 34:17, 62:16, 62:19, 62:20, 62:24
**paraphrasing** [1] - 40:24
**parse** [1] - 24:15
**Part** [1] - 15:2, 60:8
**part** [6] - 22:19, 24:1, 28:21, 30:11, 47:6, 62:1
**participate** [3] - 22:25, 63:5, 63:17
**participated** [2] - 52:1, 61:16
**participation** [1] - 63:8
**particular** [3] - 33:12, 38:9, 45:17
**particularly** [3] - 36:9, 37:7, 63:21
**parties** [1] - 30:20
**parts** [1] - 19:15
**past** [2] - 47:6, 50:2
**path** [1] - 50:2
**patience** [1] - 50:3
**Paul** [1] - 4:4
**pay** [3] - 62:10, 64:10, 64:15
**paying** [1] - 61:14
**payment** [1] - 62:14
**payments** [2] - 62:16, 62:18
**peaceful** [1] - 43:22
**penalties** [1] - 9:21
**Penalty** [1] - 8:23
**penetrate** [3] - 41:25, 42:9, 42:22
**people** [25] - 30:5,

31:22, 32:2, 33:2, 33:21, 34:18, 34:19, 34:21, 36:16, 38:19, 38:24, 40:12, 42:16, 42:17, 43:24, 48:3, 49:1, 49:14, 53:9, 53:17, 55:12, 57:22, 57:25, 61:12, 61:24
**pepper** [2] - 40:23, 42:16
**perceived** [2] - 22:9, 24:13
**perhaps** [2] - 16:10, 21:13
**period** [2] - 35:1, 62:16
**periodic** [1] - 60:21
**periods** [1] - 35:14
**permission** [1] - 65:3
**persecuted** [1] - 43:25
**person** [6] - 17:21, 33:20, 34:16, 50:18, 54:4, 55:23
**persuasive** [1] - 14:24
**pertains** [1] - 30:17
**phone** [2] - 17:21, 42:2
**phrase** [2] - 18:13, 18:21
**phrase's** [1] - 19:4
**phrased** [1] - 15:10
**phrases** [2] - 18:23, 18:24
**physical** [3] - 8:17, 9:16, 28:21
**picked** [1] - 46:2
**picture** [1] - 4:9
**pictures** [1] - 4:8
**place** [4] - 19:3, 34:7, 35:19
**placement** [2] - 60:21, 63:25
**plainly** [2] - 12:15, 26:17
**Plaintiff** [1] - 1:4
**plan** [4] - 50:14, 50:16, 50:18, 50:22
**plans** [1] - 49:14
**platform** [1] - 29:21
**played** [1] - 48:21
**plays** [2] - 34:16, 35:4
**plaza** [3] - 40:13, 41:5, 42:24
**plea** [17] - 15:20, 15:21, 21:7, 28:17, 28:18, 29:1, 29:2, 29:6, 29:8, 29:10,

48:7, 48:8, 64:22, 64:23, 65:22
**plead** [2] - 24:6, 25:22
**pleaded** [2] - 46:25, 65:23
**pleading** [2] - 31:15, 36:13
**pleadings** [1] - 47:23
**pleas** [1] - 65:11
**pled** [9] - 5:1, 5:2, 10:15, 11:4, 17:3, 17:7, 17:8, 28:8, 29:10
**plus** [1] - 56:11
**point** [9] - 11:13, 22:18, 32:1, 32:5, 32:13, 40:5, 45:2, 47:16, 54:25
**pointed** [1] - 51:3
**points** [2] - 25:15, 36:25
**police** [29] - 22:8, 22:16, 22:17, 22:22, 23:4, 23:10, 25:17, 29:17, 29:25, 40:14, 40:16, 40:23, 41:3, 41:6, 41:7, 41:8, 41:16, 41:19, 41:21, 46:20, 48:3, 53:10, 54:17, 57:9, 57:12, 57:15, 57:17, 61:17, 61:25
**Police** [1] - 52:2
**policemen** [1] - 57:18
**policy** [3] - 7:2, 26:25, 27:1
**political** [3] - 44:1, 53:11, 53:14
**poor** [2] - 31:12, 62:10
**position** [6] - 7:8, 16:5, 39:17, 40:16, 44:18, 45:9
**positive** [1] - 34:15
**positives** [2] - 2:11, 34:11
**possess** [1] - 60:15
**possession** [1] - 16:17
**possibilities** [1] - 9:3
**possibility** [1] - 21:25
**possible** [2] - 50:21, 50:24
**posts** [1] - 49:9
**potentially** [1] - 29:4
**power** [2] - 38:14, 43:22, 61:2

**pregnant** [1] - 51:16
**presence** [2] - 55:15, 64:8
**presented** [5] - 6:14, 10:9, 15:17, 17:23, 24:11
**presentence** [8] - 3:10, 4:12, 4:15, 15:25, 24:25, 34:14, 60:9, 64:18
**preserved** [1] - 24:24
**president** [1] - 57:5
**pressure** [1] - 41:17
**pretrial** [2] - 35:2, 52:15
**pretty** [1] - 53:7
**prevent** [1] - 14:5
**primary** [1] - 35:1
**prison** [7] - 18:1, 35:10, 55:9, 59:24, 59:25, 62:22, 66:8
**Prison** [1] - 66:9
**Prisons** [2] - 39:2, 59:11
**private** [1] - 33:5
**probation** [14] - 3:13, 4:22, 35:19, 55:9, 60:8, 60:22, 60:25, 62:15, 62:25, 63:7, 63:18, 64:2, 64:17, 64:19
**PROBATION** [2] - 1:20, 65:17
**Probation** [7] - 2:5, 15:25, 35:12, 35:17, 50:5, 63:2, 64:5
**Probation's** [1] - 16:5
**problem** [10] - 10:16, 15:8, 17:15, 35:9, 36:6, 57:7, 57:8, 58:16, 60:16, 63:4
**problems** [3] - 15:2, 44:8, 63:12
**proceed** [1] - 2:23
**Proceedings** [1] - 66:21
**proceedings** [1] - 67:6
**process** [5] - 17:4, 17:8, 30:9, 34:5, 50:9
**produced** [1] - 67:6
**program** [4] - 63:6, 63:7, 63:18, 63:20
**programs** [3] - 51:4, 51:5, 63:8
**progress** [2] - 64:1, 64:6
**prohibited** [1] - 63:13

**promoting** [1] - 37:4
**promulgate** [2] -
6:20, 7:1
**proof** [1] - 23:3
**proper** [1] - 4:17
**properly** [2] - 17:22,
28:11
**property** [2] - 53:23
**proposed** [1] - 17:12
**prosecution** [1] -
64:13
**prosecutors** [1] -
61:13
**protect** [1] - 55:19
**protecting** [2] -
43:21
**proud** [1] - 49:13
**provide** [2] - 62:25,
63:8
**provided** [1] - 58:9
**provider** [1] - 63:19
**provides** [1] - 40:1
**provision** [4] - 15:12,
21:14, 42:12, 43:2
**provisions** [3] -
19:15, 23:20, 59:7
**psychologically** [1] -
57:22
**PUBLIC** [1] - 1:17
**public** [5] - 2:25, 3:1,
33:4, 55:17, 55:19
**published** [2] -
18:16, 51:21
**punched** [2] - 54:20,
54:21
**punishment** [7] -
8:14, 8:15, 8:16, 8:19,
37:4, 40:2, 43:19
**purpose** [1] - 19:22
**purposely** [1] - 51:23
**purposes** [2] - 23:8,
46:3
**pursuant** [1] - 59:6
**pushed** [1] - 38:3
**pushing** [1] - 32:2
**put** [8] - 3:21, 9:16,
12:3, 12:4, 35:10,
35:25, 60:5, 66:8
**puts** [1] - 54:12
**putting** [1] - 62:21

## Q

**qualifies** [1] - 27:12
**questions** [2] - 21:1,
23:22
**quick** [1] - 19:13
**quickly** [1] - 48:23
**quieter** [1] - 33:2

**quite** [1] - 12:1
**quitting** [1] - 49:12
**quoted** [1] - 14:3

## R

**rachet** [1] - 46:2
**raise** [1] - 44:10
**raised** [3] - 5:14,
6:13, 25:7
**rally** [1] - 51:12
**range** [16] - 5:3,
15:20, 17:23, 17:25,
24:23, 29:3, 29:15,
30:17, 30:25, 42:10,
42:20, 43:8, 46:4,
58:9, 59:11, 59:12
**ranges** [1] - 42:10
**rather** [3] - 14:3,
35:9, 47:7
**rational** [1] - 56:6
**RDR** [3] - 1:22, 67:3,
67:12
**reached** [1] - 13:5
**reacted** [1] - 53:24
**reactions** [1] - 40:18
**read** [5] - 3:7, 5:17,
11:14, 28:11, 51:2
**reading** [5] - 7:25,
12:16, 19:8, 26:8,
26:18
**ready** [1] - 2:23
**realization** [1] -
33:11
**realize** [1] - 49:5
**realized** [3] - 33:9,
50:9, 56:3
**really** [12] - 9:11,
9:13, 11:9, 11:13,
12:24, 16:12, 28:4,
29:16, 56:5, 57:14,
57:24, 57:25
**reason** [7] - 17:13,
19:4, 20:15, 32:11,
37:16, 40:22, 43:12
**reasonable** [5] -
10:2, 10:3, 10:24,
11:22
**reasonably** [1] - 27:1
**reasoning** [1] - 22:24
**reasons** [10] - 10:2,
14:19, 20:21, 30:13,
38:6, 38:9, 39:9, 48:6,
56:18, 61:7
**received** [7] - 3:10,
3:14, 3:24, 46:13,
46:23, 47:3, 65:9
**receiving** [1] - 45:17
**recent** [2] - 12:23,

13:21
**recidivism** [4] - 35:7,
44:7, 44:10, 57:3
**recognition** [1] -
59:1
**recognize** [1] - 39:25
**recognized** [1] - 53:7
**recognizing** [2] -
30:24, 55:10
**recommend** [3] -
31:10, 38:8, 44:24
**recommendation** [2]
- 39:1, 66:7
**recommended** [2] -
5:3, 60:8
**recommending** [1] -
31:15
**record** [1] - 2:7
**recovery** [1] - 50:4
**reentry** [1] - 64:1
**refer** [1] - 19:6
**reference** [9] - 3:15,
8:3, 20:15, 20:22,
20:23, 21:18, 23:15,
25:12, 27:21
**references** [1] -
19:14
**referred** [1] - 25:25
**refers** [1] - 27:23
**reflects** [1] - 55:7
**Reform** [1] - 59:6
**refrain** [1] - 60:18
**regarding** [2] - 44:7,
52:10
**regret** [3] - 33:3,
33:25, 49:25
**regretful** [1] - 52:8
**regular** [1] - 17:19
**regularly** [1] - 35:3
**regulation** [5] - 7:18,
7:21, 8:4, 13:11,
26:11
**regulations** [3] -
12:22, 13:17, 19:11
**rehabilitate** [1] -
44:12
**reintegrate** [1] - 35:6
**relationship** [1] -
36:20
**relative** [1] - 47:15
**release** [11] - 35:2,
39:12, 50:14, 52:15,
59:17, 60:1, 60:3,
63:1, 63:24, 64:3,
64:17
**released** [3] - 60:17,
62:15, 62:22
**relevant** [6] - 11:6,
22:4, 22:6, 22:9,
31:18, 33:18

**rely** [1] - 12:2
**remains** [1] - 66:2
**remember** [2] -
40:24, 48:22
**remorse** [2] - 54:10,
55:24
**renovating** [1] -
34:24
**reoffend** [1] - 44:9
**repeating** [1] - 40:6
**report** [13] - 3:10,
3:13, 4:12, 4:16,
15:25, 25:1, 34:15,
60:9, 64:2, 64:6, 64:7,
64:18, 64:21
**REPORTED** [1] -
1:22
**Reporter** [2] - 1:22,
67:12
**republic** [1] - 53:15
**request** [2] - 61:2,
65:3, 65:4
**requested** [1] - 62:25
**requests** [1] - 46:21
**require** [2] - 17:9,
17:10
**required** [1] - 64:8
**requirements** [1] -
53:4
**resist** [1] - 23:10
**resisting** [1] - 47:5
**resolution** [2] - 25:3,
35:24
**respect** [2] - 37:4,
55:6
**respects** [1] - 18:8
**responsibilities** [1] -
58:6
**responsibility** [3] -
34:4, 34:5, 36:12
**responsible** [2] -
41:13, 61:22
**rest** [1] - 43:17
**restitution** [20] -
38:11, 38:21, 47:20,
47:25, 48:6, 61:1,
61:2, 61:6, 61:8, 61:9,
61:14, 61:23, 62:5,
62:8, 62:9, 62:10,
62:13, 62:20, 62:24
**result** [5] - 13:5,
15:11, 42:18, 56:18,
57:5
**resulted** [1] - 24:14
**resulting** [2] - 50:1,
61:20
**resume** [2] - 45:15,
56:20, 56:21
**retired** [1] - 57:21
**retreat** [2] - 41:8,

41:18
**return** [3] - 49:21,
58:21, 64:20
**returning** [1] - 47:16
**reveals** [1] - 32:8
**reveling** [1] - 41:2
**review** [3] - 3:7, 3:12,
53:2
**reviewed** [7] - 3:17,
3:18, 3:23, 4:2, 4:4,
4:10, 53:2
**reviewing** [1] - 12:7
**revoke** [1] - 5:10
**Rhode** [1] - 37:8
**riot** [15] - 29:20,
29:21, 48:1, 51:15,
54:14, 55:12, 55:14,
56:18, 57:4, 57:8,
57:12, 57:19, 61:16,
61:18
**rioted** [1] - 53:10
**rioters** [7] - 22:17,
23:3, 40:15, 40:17,
41:14, 41:15, 41:17
**risk** [1] - 35:7
**rob** [1] - 16:25
**role** [4] - 34:15, 35:4,
48:21, 50:17
**ROMANO** [12] - 1:14,
2:8, 18:2, 18:4, 18:7,
24:1, 39:19, 47:15,
47:22, 65:20, 65:22,
66:1
**Romano** [4] - 2:9,
2:16, 18:3, 39:17
**room** [1] - 42:3
**Room** [1] - 1:24
**rule** [2] - 24:22,
30:12
**rules** [3] - 7:13,
26:11, 63:6
**running** [1] - 66:14

## S

**saddest** [1] - 53:8
**safe** [2] - 49:21,
51:19
**sake** [1] - 41:2
**sank** [1] - 49:7
**SARGENT** [1] - 1:6
**Sargent** [35] - 2:4,
2:18, 2:20, 3:3, 3:9,
3:20, 4:6, 4:9, 4:24,
5:7, 6:8, 25:5, 31:10,
31:17, 32:3, 32:4,
32:9, 32:21, 33:1,
33:8, 34:11, 34:15,
34:23, 35:13, 35:21,

36:19, 38:16, 39:16, 41:11, 41:24, 42:22, 48:11, 51:1, 59:10, 66:8

**Sargent's** [10] - 3:11, 3:24, 4:3, 4:4, 12:1, 15:3, 27:11, 29:19, 31:4, 37:23

**satisfy** [1] - 23:13
**saved** [1] - 53:19
**saw** [10] - 23:3, 29:22, 40:22, 40:25, 41:20, 49:6, 51:24, 52:4, 61:23, 61:24
**scaled** [1] - 22:14
**scared** [1] - 33:24, 34:5, 51:18
**scheme** [1] - 14:20
**second** [2] - 26:3, 57:10
**section** [1] - 9:22
**Section** [3] - 6:11, 19:9, 25:13
**see** [12] - 5:23, 9:20, 10:22, 13:14, 15:2, 22:16, 22:17, 52:22, 55:18, 58:12, 58:17
**seeing** [3] - 22:19, 54:14, 57:12
**seeking** [4] - 19:19, 22:1, 46:14, 48:7
**seem** [1] - 28:19
**send** [1] - 43:17
**sending** [1] - 44:2
**SENIOR** [1] - 1:11
**sense** [1] - 29:5
**sentence** [31] - 4:19, 5:3, 5:4, 5:8, 17:20, 23:21, 30:23, 31:19, 38:4, 39:22, 39:23, 45:7, 46:21, 53:19, 55:6, 55:21, 58:7, 58:10, 58:11, 59:4, 59:5, 62:12, 64:19, 64:24, 65:7, 65:16, 66:6, 66:8, 66:20
**sentenced** [2] - 56:7, 59:16
**sentences** [10] - 17:23, 19:17, 44:17, 46:22, 47:3, 53:4, 55:8, 56:6, 56:12, 66:13
**sentencing** [36] - 2:24, 3:2, 3:15, 3:18, 3:19, 3:21, 3:24, 4:17, 5:13, 15:14, 17:19, 19:12, 20:3, 22:12, 23:18, 26:22, 37:3, 39:11, 39:18, 39:25,

40:3, 42:20, 44:2, 44:17, 44:19, 44:22, 45:1, 45:7, 46:12, 46:17, 47:18, 56:8, 58:9, 59:8, 60:9, 65:12
**Sentencing** [5] - 6:20, 6:24, 6:25, 12:3, 59:6
**SENTENCING** [1] - 1:10
**separate** [5] - 14:23, 16:12, 16:14, 16:17, 30:8
**separated** [1] - 51:18
**separates** [1] - 29:2
**September** [1] - 4:11
**series** [1] - 4:8
**serious** [15] - 9:17, 10:4, 10:7, 18:19, 19:23, 20:13, 20:18, 27:14, 31:14, 32:10, 37:25, 38:1, 40:7, 43:18, 58:16
**seriously** [1] - 57:13
**seriousness** [4] - 39:25, 40:4, 44:3, 55:7
**serve** [1] - 59:16
**served** [3] - 5:9, 59:19, 59:24
**Services** [1] - 50:16
**serving** [2] - 45:13, 45:19
**set** [3] - 8:25, 39:20, 56:5
**several** [9] - 7:16, 7:20, 20:5, 20:7, 33:23, 52:3, 52:7, 52:15, 56:19
**severe** [1] - 18:18
**severity** [1] - 49:5
**sexual** [2] - 16:17
**shall** [2] - 60:6, 64:20
**shameful** [1] - 53:14
**share** [1] - 44:6
**shocked** [1] - 52:4
**shorter** [1] - 38:4
**shoved** [1] - 38:3
**show** [3] - 6:8, 35:5, 41:24
**shown** [1] - 33:20
**shows** [2] - 19:15, 22:3
**sides** [2] - 28:3, 56:10
**significant** [4] - 7:7, 31:8, 43:16, 43:17
**significantly** [1] - 38:1

similar [4] - 12:1, 44:9, 46:22, 48:6
**simple** [1] - 8:14
**simply** [4] - 10:6, 10:10, 10:24, 42:16
**sincere** [1] - 33:3
**situation** [11] - 4:1, 36:8, 48:14, 48:18, 56:24, 56:25, 58:3, 58:14, 58:25, 62:9, 64:10
**six** [7] - 5:1, 31:10, 38:5, 38:8, 39:10, 46:22, 59:14
**size** [1] - 41:3
**slapping** [2] - 52:10, 57:10
**Sleeper** [1] - 1:18
**slight** [2] - 19:2, 55:11
**Slip** [1] - 50:16
**small** [1] - 65:20
**smell** [1] - 51:17
**smoke** [1] - 51:17
**sobriety** [2] - 35:15, 50:13
**social** [3] - 34:21, 40:19, 51:5
**society** [2] - 35:6, 63:22
**solve** [1] - 10:16
**someone** [2] - 54:21, 58:22
**somewhat** [2] - 4:1, 38:24
**somewhere** [1] - 47:3
**son** [8] - 4:6, 32:25, 34:25, 50:11, 50:20, 52:22, 52:24
**sons** [1] - 50:17
**sorry** [1] - 54:25
**sort** [3] - 5:17, 41:16, 54:12
**source** [1] - 36:21
**sources** [1] - 51:11
**south** [1] - 47:3
**special** [1] - 59:20
**specific** [8] - 17:9, 31:11, 32:18, 34:9, 43:15, 44:5, 45:2, 55:20
**specifically** [1] - 39:23
**specification** [1] - 9:13
**spectrum** [2] - 53:17, 54:12
**spend** [1] - 34:17
**spray** [2] - 40:23,

42:17
**staff** [1] - 57:15
**standard** [1] - 38:24
**start** [6] - 5:12, 6:17, 11:19, 18:4, 30:5, 45:5
**state** [3] - 2:6, 19:1, 60:13
**statement** [1] - 26:25
**statements** [6] - 7:2, 27:2, 29:20, 54:4, 55:25, 56:1
**States** [11] - 1:23, 2:3, 2:9, 12:11, 13:20, 14:4, 14:8, 27:2, 28:7, 45:13, 67:13
**STATES** [3] - 1:1, 1:3, 1:11
**status** [1] - 64:3
**statute** [18] - 6:2, 6:23, 7:25, 8:4, 8:7, 8:8, 9:8, 9:17, 9:20, 12:15, 14:21, 19:18, 19:19, 21:4, 21:5, 23:10, 26:17, 64:13
**Statute** [1] - 19:10
**statutes** [9] - 18:25, 19:13, 19:16, 27:20, 27:23, 27:24, 61:3, 62:7, 62:12
**statutory** [4] - 8:1, 8:12, 19:14
**stay** [1] - 2:14
**stenographic** [1] - 67:5
**step** [2] - 8:10, 33:10
**stepped** [1] - 22:7
**steps** [5] - 7:16, 7:20, 12:25, 43:11, 43:12
**still** [8] - 9:25, 13:16, 31:10, 33:12, 34:6, 38:8, 52:5, 52:8
**sting** [1] - 37:2
**Stinson** [13] - 12:12, 12:20, 13:6, 13:12, 13:14, 13:15, 13:23, 13:24, 14:3, 14:6, 14:16, 26:18, 27:6
**stop** [1] - 30:4
**straight** [1] - 64:22
**strangling** [1] - 27:15
**strangulation** [4] - 9:13, 10:6, 19:25, 20:9
**strap** [1] - 46:2
**Street** [2] - 1:15, 1:18
**stress** [3] - 35:23, 46:10, 49:25

strike [3] - 22:8, 22:21, 47:7
**strips** [1] - 15:12
**strong** [2] - 44:2, 66:7
**stronger** [1] - 31:4
**struck** [1] - 54:18
**structure** [1] - 19:22
**stuck** [1] - 42:4
**subject** [1] - 60:14
**submission** [1] - 22:12
**submit** [4] - 60:20, 63:12, 64:2, 64:5
**submits** [6] - 18:7, 18:12, 23:18, 24:18, 47:9, 47:17
**Subsection** [4] - 8:21, 8:22, 9:5, 9:22
**subsection** [2] - 7:1, 8:20
**substance** [6] - 60:15, 60:19, 63:4, 63:5, 63:11, 63:12
**substances** [1] - 63:13
**substantial** [1] - 55:21
**substantially** [2] - 42:20, 46:13
**succeed** [1] - 52:23
**succeeded** [1] - 57:9
**succinct** [1] - 16:10
**suffering** [1] - 50:10
**sufficient** [4] - 6:7, 38:8, 62:6, 65:19
**suffocation** [1] - 20:9
**suggest** [1] - 33:6
**suggests** [1] - 35:7
**suicide** [1] - 57:19
**summarized** [1] - 64:2
**superseding** [2] - 65:24, 66:5
**supervise** [1] - 63:19
**supervised** [6] - 39:12, 59:17, 60:1, 60:3, 63:7, 64:4
**supervision** [5] - 60:6, 60:11, 60:21, 63:25, 64:7
**supply** [1] - 18:11
**support** [7] - 3:23, 4:5, 31:8, 34:22, 35:5, 44:11, 58:15
**supporting** [1] - 55:15
**Supreme** [5] - 7:24, 12:11, 25:24, 26:4,

27:5
**surges** [1] - 47:6
**suspending** [1] -
56:19
**sustained** [3] -
41:10, 41:17, 45:12
**swing** [1] - 31:13
**swings** [2] - 30:3,
31:24
**swung** [2] - 31:20,
32:12
**system** [1] - 19:1
**systems** [1] - 19:1

**T**

**T.J** [1] - 50:20
**tear** [1] - 61:25
**teargas** [1] - 40:23
**term** [6] - 18:9,
19:10, 31:15, 59:11,
59:16, 60:4
**terms** [3] - 46:13,
59:13, 60:3
**terrace** [4] - 22:13,
22:15, 41:9, 41:12
**terrified** [1] - 57:16
**test** [6] - 11:6, 13:6,
13:15, 15:10, 23:13,
60:20
**tested** [1] - 35:16
**testing** [2] - 63:11,
63:12
**tests** [2] - 7:14,
60:21
**that'll** [6] - 59:12,
60:17, 62:16, 63:7,
66:6, 66:20
**THE** [68] - 1:1, 1:10,
1:14, 1:17, 1:17, 2:1,
2:2, 2:14, 2:19, 2:22,
2:23, 3:6, 6:1, 6:10,
6:12, 7:8, 7:13, 8:9,
9:9, 10:13, 10:21,
11:1, 11:8, 12:7,
12:11, 13:8, 13:12,
13:20, 15:1, 15:13,
15:19, 16:9, 16:20,
16:24, 17:2, 17:14,
18:3, 18:6, 23:24,
24:21, 33:17, 33:22,
35:8, 36:2, 36:5,
37:12, 37:15, 37:18,
38:13, 39:4, 39:6,
39:8, 39:13, 39:16,
47:14, 47:20, 48:10,
48:20, 51:1, 65:17,
65:19, 65:21, 65:25,
66:4, 66:11, 66:16,

66:17, 66:18
**theoretically** [1] - 6:7
**thereafter** [2] -
53:11, 60:22
**therefore** [2] - 30:22,
64:23
**therein** [1] - 19:7
**thinks** [1] - 48:5
**Third** [11] - 7:5,
11:13, 11:18, 11:23,
12:17, 12:18, 13:2,
13:18, 14:9, 14:17,
26:20
**THOMAS** [1] - 1:10
**threat** [2] - 36:7, 43:4
**three** [6] - 8:13, 9:7,
10:7, 10:23, 42:19,
54:21
**threw** [1] - 38:2
**throw** [1] - 42:17
**tied** [1] - 38:24
**Title** [3] - 4:20,
59:22, 62:11
**title** [1] - 8:22
**today** [5] - 3:3, 3:12,
3:16, 25:7, 65:1
**together** [2] - 4:10,
23:20
**tolerant** [2] - 33:2,
50:7
**tomorrow** [1] - 65:2
**took** [2] - 9:15, 50:9
**tools** [3] - 8:1, 8:3,
8:11
**total** [1] - 4:22
**totality** [1] - 23:14
**tough** [2] - 55:2, 55:3
**tower** [6] - 22:14,
22:20, 29:21, 51:23,
54:15, 61:24
**track** [2] - 9:7, 10:23
**tracks** [1] - 18:22
**trades** [1] - 50:15
**traditional** [2] - 8:1,
8:11
**TRANSCRIPT** [1] -
1:10
**transcript** [3] - 46:7,
67:5, 67:6
**transfer** [1] - 43:22
**transferred** [1] - 2:21
**transpire** [1] - 49:5
**traumatic** [1] - 45:12
**treat** [3] - 35:8,
35:12, 43:24
**treatment** [11] -
35:12, 35:13, 35:16,
35:18, 52:15, 52:17,
63:6, 63:16, 63:17,
63:19, 64:20

**tremendous** [1] -
57:22
**tried** [8] - 12:3, 22:8,
22:21, 30:2, 41:25,
42:8, 42:22, 57:10
**troubles** [1] - 50:1
**Troy** [4] - 2:4, 4:6,
33:8, 59:10
**TROY** [1] - 1:6
**true** [3] - 54:10, 67:4,
67:5
**truly** [2] - 34:4, 48:24
**truth** [1] - 44:1
**try** [7] - 9:18, 34:3,
39:3, 53:13, 56:8,
56:12, 56:14
**trying** [3] - 8:4,
12:18, 47:7
**tunnel** [2] - 41:9,
41:12
**turn** [1] - 20:25
**turned** [2] - 48:23,
49:6
**turning** [1] - 36:13
**TV** [3] - 49:6, 52:4,
57:12
**twice** [2] - 28:12,
54:18
**two** [19] - 5:9, 8:15,
8:19, 13:23, 19:15,
23:5, 23:12, 31:24,
32:23, 39:11, 50:17,
59:17, 59:18, 59:23,
59:24, 60:2, 60:17,
60:21, 61:6
**two-month** [1] - 5:9
**type** [5] - 20:6, 20:8,
57:3, 57:6, 61:22
**types** [1] - 44:21,
58:20

**U**

**U.S** [2] - 1:14, 1:20
**unarmed** [3] - 45:23,
46:11, 46:19
**unavailable** [1] -
65:8
**under** [24] - 4:25,
7:14, 9:4, 13:6, 15:2,
19:17, 25:24, 26:12,
26:18, 27:7, 27:12,
30:18, 42:12, 47:1,
47:2, 52:14, 53:1,
58:23, 59:22, 60:2,
62:5, 64:13, 64:24,
65:6
**underlies** [3] - 7:3,
7:5, 28:14

**underlying** [2] -
16:22, 29:18
**understood** [2] -
10:14, 23:1
**undeserved** [1] -
49:23
**unfortunately** [1] -
54:24
**UNITED** [3] - 1:1,
1:3, 1:11
**united** [1] - 1:23
**United** [10] - 2:3, 2:9,
12:11, 13:20, 14:4,
14:8, 27:2, 28:7,
45:13, 67:13
**unknown** [1] - 35:22
**unlawful** [1] - 60:18
**unlawfully** [1] -
60:15
**unless** [3] - 12:14,
26:11, 26:16
**unrest** [3] - 30:10,
52:1, 61:19
**unwarranted** [5] -
40:2, 44:16, 44:19,
47:18, 49:23
**up** [22] - 3:16, 5:22,
8:16, 8:23, 12:6,
29:21, 32:14, 37:19,
37:20, 46:2, 47:4,
50:18, 51:9, 51:15,
52:22, 52:23, 54:5,
54:13, 56:5, 58:18,
59:23, 61:13
**upheld** [1] - 16:13
**urge** [1] - 14:17
**USC** [12] - 6:23, 8:7,
8:21, 19:16, 39:20,
42:25, 47:1, 47:2,
59:7, 62:11, 64:24,
65:6

**V**

**VA** [1] - 45:14
**valid** [1] - 10:10
**valuation** [1] - 28:10
**variance** [4] - 31:8,
32:18, 58:24, 59:3
**varied** [1] - 55:9
**variety** [2] - 19:12,
46:16
**various** [7] - 4:24,
5:1, 35:13, 48:17,
51:4, 52:16, 55:4
**vary** [2] - 45:4, 58:8
**versus** [16] - 2:4,
6:21, 7:3, 7:15, 7:23,
12:12, 12:23, 13:4,

13:8, 13:21, 14:4,
14:9, 26:7, 26:9, 27:2,
28:7
**via** [1] - 47:23
**vicinity** [1] - 63:9
**videos** [2] - 3:15,
3:16
**view** [4] - 22:16,
47:12, 48:14, 51:6
**viewed** [2] - 20:11,
20:16
**viewing** [2] - 29:22,
32:5
**views** [2] - 50:8,
51:7, 56:13
**violates** [2] - 12:14,
26:16
**violation** [3] - 21:4,
60:14
**violence** [10] - 22:19,
22:20, 40:14, 40:20,
41:2, 41:3, 43:4,
53:22, 53:24
**violent** [2] - 40:9,
41:10
**Virginia** [2] - 37:9,
37:10
**visitation** [1] - 39:3
**visor** [1] - 54:21
**volunteering** [1] -
50:23
**vote** [3] - 30:10,
56:23, 61:21
**vs** [1] - 1:5
**vulnerable** [1] -
41:21

**W**

**waiting** [1] - 50:16
**waived** [1] - 65:14
**walked** [2] - 51:14,
55:14
**Washington** [4] -
1:6, 1:15, 1:25, 67:14
**watch** [1] - 52:23
**ways** [4] - 9:2, 17:17,
32:10, 49:24
**weapon** [11] - 8:25,
9:12, 10:5, 18:20,
20:4, 20:6, 27:14,
32:13, 38:2, 42:20,
46:3
**weapons** [16] -
19:23, 20:11, 20:17,
20:19, 31:21, 31:23,
32:3, 41:24, 41:25,
42:7, 42:14, 42:16,
45:24, 45:25, 46:15,

46:16
**week** [1] - 37:14
**weeks** [2] - 33:23, 57:18
**weighed** [1] - 45:19
**weighs** [1] - 55:20
**weight** [7] - 19:7, 26:1, 26:5, 26:9, 27:4, 27:9, 33:19
**well-equipped** [1] - 44:14
**west** [7] - 22:13, 22:15, 40:13, 41:5, 41:8, 41:12, 42:24
**Western** [1] - 37:8
**white** [2] - 11:17, 11:23
**whole** [1] - 48:4
**wife** [2] - 51:14, 51:16
**wildly** [1] - 40:16
**Wilkie** [8] - 7:4, 7:15, 7:23, 12:23, 13:4, 13:8, 26:8, 26:10
**wish** [3] - 33:10, 34:7, 48:23
**wished** [1] - 34:1
**wishes** [1] - 33:11
**word** [1] - 11:21
**wording** [1] - 40:24
**words** [2] - 55:17, 65:10
**wore** [2] - 41:3, 41:16
**world** [1] - 58:19
**worried** [1] - 49:20
**worse** [3] - 32:6, 35:9, 47:9
**worst** [1] - 58:2
**worth** [3] - 13:18, 22:2, 61:5
**wound** [1] - 32:14
**wrapped** [2] - 47:4, 51:9
**wrote** [2] - 3:13, 34:14

**Y**

**year** [4] - 4:11, 8:15, 47:3, 63:22
**years** [9] - 8:16, 8:23, 32:23, 39:11, 55:9, 59:17, 59:18, 60:3, 60:17
**younger** [2] - 55:2, 55:22
**youngest** [1] - 50:19
**youngster** [2] - 55:2,

58:5
**yourself** [2] - 55:19, 58:20
**YouTube** [1] - 51:4

**Z**

**zero** [1] - 36:25